STATE OF HAWAII, Plaintiff-Appellee, *v.* MICHAEL "JOJO" MATA, Defendant-Appellant

NO. 7229

JUNE 27, 1980

HAYASHI, C.J., PADGETT AND BURNS, JJ.

*Per Curiam*. Defendant Mata appeals from a judgment of conviction, in a Third Circuit bench trial, on October 19, 1978, for promoting a dangerous drug in the second degree, in violation of section 712-1242, Hawaii Revised Statutes. This appeal involves three issues: (1) whether the State's conduct before the grand jury was so improper and sufficiently prejudicial that the indictment should have been dismissed; (2) whether Mata was denied his right to a speedy trial; and (3) whether the State's evidence was sufficient to prove that the drug Mata sold was prohibited by law. Defendant raised the first two of these issues by way of separate motions to dismiss indictment, both of which the trial court denied. The third issue was raised in a motion for acquittal, brought at the close of the State's case, which the trial court also denied.

## STATE'S CONDUCT BEFORE THE GRAND JURY

Officer Kenneth W. Mathison testified that in his role as an undercover vice squad officer he had purchased 15 capsules of what the defendant claimed was percodan for $52.50, on February 20, 1977, at the Keawe Diner, in Hilo. After Mr. Halsted, the deputy prosecuting attorney, completed his questioning of Officer Mathison, the following dialogue ensued:

THE JUROR: Did you know that this Michael Jojo Mata to be someone who was supposedly under suspicion of promoting?

THE WITNESS: At the time of the purchase, no. Following that, *after the evidence was turned over, I was informed that he was suspected, and did have a past record of doing this type of thing.*

MR. HALSTED: Any questions?

(No response, from the grand jury.)

MR. HALSTED: There appear to be no questions. You're excused. Please wait outside. (Witness leaves the grand jury room.)

MR. HALSTED: With respect to the witness's last response, of Officer Mathison, he alluded to an alleged prior record, of this individual.

I would instruct you that you do not consider prior record, in terms of whether it exist [sic] or not, in terms of evaluating this case.

The only evidence that does come with the case, is what you hear, under oath, that you may consider.

Whether a person has been in trouble, in the past or not, usually — should not effect, in fairness to that person, your decision, in this case.

In other words, whatever is in the past, shouldn't effect the strength or the weakness of the case.

It depends on what the evidence shows. Whether there is probable cause, or not. I think that should be made perfectly clear, on the record.

*I think that the officer is trying to answer your questions.*

*I don't think that he is familiar with the grand jury.*

*I just want to make that clear, in fairness to the defendant.*

(Emphasis added.)

\* \* \* \* \*

Detective Sgt. Edwin Rapoza testified that he had received from Officer Mathison the 15 capsules allegedly bought from Mata. Then:

THE JUROR: Were you there, when they had purchased the capsule, from Mata?

THE WITNESS: No, sir. We do not want to pull surveillance on the establishment, in fear of burning the undercover officer.

Because they are all aware of our vehicles, as well as our secondary vehicles. And they are well aware of our faces.

And for that particular purpose, it was one of many that we did not post surveillance on.

*There were several counts that appeared other times that we did post surveillance.*

(Emphasis added.)

\* \* \* \* \*

Kenneth Saito, a "criminalist" with the Honolulu Crime Lab, testified that he had examined and analyzed the capsules allegedly bought from Mata and had determined that they were methaqualone hydrochloride. After Mr. Halsted concluded his questioning, none of the jurors asked any questions of Mr. Saito. Then:

MR. HALSTED: We have no further witnesses to present, in this first case.

Does anyone have some questions, with respect to the law?

A JUROR: I don't know about the law, but I don't know what this charge that you are talking about.

Does this effect the body?

MR. HALSTED: That would be a question of fact. Perhaps, we could recall Mr. Saito, if necessary. I cannot anwer that. I cannot answer questions of fact, as I previously indicated.

THE JUROR: What effect does it do, to the body, whether it is harmful or not.

MR. HALSTED: Let me answer it this way. I cannot make representations as to what the drug does, or does not do, for you, personally.

But if you want to ask that question, directly to the witnesses, you can.

But with respect to the section, itself, promoting a dangerous drug, in the second degree. There is no requirement that the State prove or show that an actual harm took place, to an individual. If somebody got high, or somebody got stoned.

We are required to show, in the words of the statutes:

"A person commits the offense of promoting a dangerous drug in the second degree if he knowingly:

(c) Distributes any dangerous drug in any amount."

I'm not sure if that answers you, in terms of your question.

THE JUROR: I am trying to determine, what they consider a dangerous drug.

MR. HALSTED: Dangerous drugs are defined by law. It means that a Schedule I substance or Schedule II substance, under chapter 329.

And as I indicated, under chapter 329 of the Hawaii Revised Statutes, on Schedule II, on chapter 329-16, subsection (D), methaqualone is carried, or listed as a Schedule II substance.

When we talk about the schedules, I am referring to the way that the Hawaii Revised Statutes is set up. *They follow the Federal law.*

We have something called the Uniform Controlled Substances Act.

And my understanding of this, is that through the decisions by the Department of Health — because 329 is in the Health section of the statutes. *And through legislative enactment, certain drugs, apparently in degree of their — I don't want to use the word "dangerousness" — but what it can do to your person, are classified through five different schedules.* The schedules are very lengthy.

They go from Schedule 1 down to at least, Schedule V. And *these schedules are constantly revised.*

What I have referred you to, is Schedule II substance, 329-16 subsection (d), which does list methaqualone.

But I am not a doctor. I can't answer that.

THE JUROR: You answered my question. Thank you.

(Emphasis added.)

\*　　\*　　\*　　\*　　\*

Mata argues that, viewed in their totality, the emphasized statements were so improper and prejudicial that dismissal of the indictment was required.

In its written order denying Mata's motion, the trial court found that the prosecutor's remarks "did not amount to misconduct of any kind"; that the responses of Officers Mathison and Rapoza "were not so prejudicial as to require dismissal . . . and did not deprive the defendant of a fair grand jury

proceeding"; and that Mata "failed to prove any type of prejudice . . . so as to deprive him of a fair grand jury proceeding".

A motion to quash an indictment is addressed to the discretion of the trial court. *See State v. Joao*, 53 Haw. 226 at 230, 491 P.2d 1089 at 1092 (1971). In proceedings determining the validity of an indictment, the defendant is required to come forward and prove prejudice. *State v. Scotland*, 58 Haw. 474 at 476, 477, 572 P.2d 497 at 499 (1977). When sufficient legal and competent evidence is presented to a grand jury, the reception of illegal or incompetent evidence does not authorize the court to set aside an indictment if the remaining legal evidence considered as a whole is sufficient to warrant the indictment. *State v. Apao*, 59 Haw. 625 at 637, 586 P.2d 250 at 258-259 (1978).

We hold that the trial court did not abuse its discretion in denying Mata's motion to dismiss the indictment.

Officer Mathison's comment that he was informed that Mata "did have a past record of doing this type of thing" was immediately followed by the deputy prosecutor's instruction to the jurors to "not consider prior record . . . in terms of evaluating this case". The question which led to the response was posed not by the deputy prosecutor, but by a grand juror.

Officer Rapoza's comment that "[t]here were several counts that appeared other times that we did post surveillance" was also given in response to a juror's question. In context, this ambiguous statement appears to be a reference to police practices in drug cases, rather than a way of suggesting that Mata was involved in other offenses.

The deputy prosecutor's statements regarding the structure of the law and the classification of drugs were surrounded by his disclaimers of expertise and were not germane to the jurors' task. His comments regarding Officer Mathison's unfamiliarity with grand jury proceedings, while arguably ill-advised, were not sufficient to require dismissal of the indictment, either alone or in combination with the statements referred to above.

*SPEEDY TRIAL*

Mata was indicted on January 24, 1978, arrested on January 30 and posted bond on January 31.[1] At arraignment and plea on February 13, 1978, the court set March 7, 1978 as the deadline for submission of pretrial motions and scheduled the trial for April 24 and April 25, 1978. In setting the trial date, the court stated that "[t]he reason for that late setting is that the Court and both counsel are aware that the Court has a trial all of March that will go into the first week of April". In a March 29, 1978 hearing on a pretrial motion, defense counsel stated that he "would be surprised" if the trial were actually held on April 24 "in view of what's happening in this courtroom". The court stated that "[t]he length in the so-called Madamba case is going another three weeks for jury selection and four weeks thereafter. The likelihood is that this trial would have to be reset."

In a June 22, 1978 hearing on a Motion to Reset Defendant's Motion to Dismiss the Indictment (this one based on pre-indictment delay), the court set July 3, 1978 as the deadline for submission of written arguments on the motion.

On July 19, 1978, at a hearing on a Motion to Set Motions Pending and Trial Date, the court noted that apparently neither side had yet submitted written arguments and asked if the attorneys were prepared to proceed on oral argument instead. Answering first, defense counsel requested an opportunity to review the matter and requested a new deadline of July 31, 1978. Defense counsel also agreed to the State's request to submit its written argument by August 7, 1978. Also on July 19, 1978, the court took up the Motion to Reset the Trial. Defense counsel for the first time affirmatively requested a trial date. He requested "a late September trial date". Late September was not available. The court

---

[1] There was an 11-month delay in this case between the date of the offense (February 20, 1977) and the date of the indictment (January 24, 1978). Mata challenged the validity of the indictment, based on this pre-indictment delay, in another pretrial motion. His motion to dismiss the indictment on that basis was denied and he has not raised this issue on appeal.

offered to give the case preference over other more recent criminal cases and civil cases and to set the trial for September 7. The court asked defense counsel "in reference to the two month delay" if he had discussed the request for a September trial date with the defendant and if the defendant had any objection. Defense counsel stated that he had not discussed it with the defendant and invited the court to do so. The court asked the defendant if he understood that "any delay may run into certain theoretical problems, such as the memory of witnesses, a continued anxiety on your part, if such exists — and those are but some of the major concerns". The defendant replied that he understood that and that he had no objections to a September 7 trial date.

On September 7, at a hearing on the court's own motion to reset jury trial, the court explained that it was then involved in two simultaneous jury trials and that Mata's trial would have to be reset.

Defense counsel did not formally object but did make it clear that raising the issue of a speedy trial was a possibility.

On September 15, 1978, Mata filed a motion to dismiss the indictment based on the alleged violation of his right to a speedy trial. In its September 28 hearing on this motion, the court, in denying the motion, took judicial notice of its calendar and diary from January 3, 1978. At that hearing the court stated that "the diary and the record will indicate that because of the exceptional circumstances this year, particularly in the first half of this year in relation to the court's extremely crowded, congested trial docket and calendar that this matter had to be delayed". The court also stated that:

> . . . the crowded docket is not limited to the First Division but the Second Division as well to such an extent that the chief clerk has requested of the State judiciary for the assignment of an additional judge because of the extremely crowded calendar and the problems of the scheduling of cases, particularly criminal cases in the Third Circuit Court in the circuit level. And the matter has been referred to the administrator [sic] judge of the First Circuit Court to see what relief can be provided to the Third Circuit. . . .

Mata claims that the trial court erred in denying his motion to dismiss the indictment. He asserted both a constitutional basis and one founded on rule 48, Hawaii Rules of Penal Procedure.

The sixth amendment to the United States Constitution and article I, section 14 of the Constitution of the State of Hawaii require that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial". The framework for analysis of a claim that this constitutional right has been denied in a particular case is in large part derived from the case of *Barker v. Wingo*, 407 U.S. 514 (1972). *State v. Almeida*, 54 Haw. 443, 509 P.2d 549 (1973).

*Barker* established four pertinent factors to be considered: (1) length of delay; (2) the reason for the delay; (3) defendant's assertion of his right; and (4) prejudice to the defendant. 407 U.S. at 530. The weight to be given each of the factors in determining whether the right to a speedy trial has been violated must be determined on an ad hoc basis. *Id*. The presence or absence of any single factor is not dispositive. 407 U.S. at 544.

The delay in this case is sufficient to trigger the inquiry outlined in *Barker*.

The primary reason for the delay was the court's congested trial docket, which was due to what the court characterized as "exceptional circumstances". In analyzing various reasons for delay, the U.S. Supreme Court has indicated that:

> . . . different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker, supra*, at 531.

The defendant's assertion of his right to a speedy trial is, on this record, somewhat ambiguous. Defense counsel did,

on July 19, 1978, almost six months after the indictment, affirmatively request a trial date, but the date requested was two months in the future. We do not deem this a waiver of defendant's right but consider it along with all other pertinent factors.

The fourth factor to be considered is prejudice to the defendant.

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker, supra,* at 532 (footnote omitted).

Here, oppressive pretrial incarceration was not a factor. Nor, from the record, was anxiety and concern of the accused.

As for possible impairment of the defense, the evidence supporting the view that the defense was impaired by the delay following the indictment is scanty at best. At an April 28, 1978 pretrial hearing, defendant did testify that neither he nor his wife could remember where he was and what he was doing on February 20, 1977 (the date of the offense). But he also stated that he didn't have any trouble remembering that he had never seen Officer Mathison until the day of that hearing. He never claimed that witnesses had died, disappeared or otherwise become unavailable. At the trial, defendant chose to rest without presenting any evidence.

Thus, the only actual prejudice arguably shown in the record is his alleged inability to remember events on or about the date of the offense. But 11 of the 20 months that passed between the date of the offense (February 20, 1977) and the date of trial (October 19, 1978) were prior to the indictment (January 24, 1978). These 11 months cannot be weighed against the State in constitutional speedy-trial analysis, since Mata's right to a speedy trial was born on January 24, 1978,

the date of the indictment. *State v. Almeida*, 54 Haw. at 446, 509 P.2d at 551. And certainly, as soon as he had obtained legal counsel, which was before the arraignment and plea on February 13, 1978, Mata had ample reason to make every effort to recall and record every fact that might be useful to his defense.

We hold that the trial court did not err in denying the defendant's constitutionally-based speedy trial motion to dismiss the indictment, primarily because, in viewing the relevant factors together, we believe that any presumption of prejudice arising from the length of the post-indictment delay is rebutted by the record.

As for the rule 48 speedy-trial claim, we hold that a period of delay should be excluded in computing the time for trial commencement, in accordance with clauses (c)(2) and (c)(3) of rule 48.[2] The record establishes a prima facie showing that the congestion of the trial docket was attributable to exceptional circumstances. The record also indicates a continuance granted with the consent of defendant and his counsel. Taking the excluded periods into account brings the elapsed time from indictment to the date of defendant's motion (and also to the trial) well within the six-month period mandated by the rule. There was, therefore, no error in the trial court's denial of defendant's rule 48 motion to dismiss the indictment.

### SUFFICIENCY OF EVIDENCE

Mata's final argument is that the State failed to prove all elements of the offense charged beyond a reasonable doubt. The indictment charged him with violating Hawaii Revised Statutes (HRS) section 712-1242, Promoting a Dangerous

---

[2] Hawaii Rules of Penal Procedure, rule 48. *DISMISSAL.* ". . . (c) *Excluded Periods.* The following periods shall be excluded in computing the time for trial commencement: . . . (2) periods of delay resulting from congestion of the trial docket when the congestion is attributable to exceptional circumstances; (3) periods of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel; . . ."

Drug in the Second Degree, by knowingly distributing "methaqualone hydrochloride, a dangerous drug". The State had to prove that the capsules Officer Mathison purchased from Mata contained any quantity of *methaqualone,* the substance actually proscribed. *See* HRS section 712-1242, subsection (1) of HRS section 712-1240, and subsections (a) and (d)(1) of HRS section 329-16.

Mata argues that because the State's expert witness never specifically testified that methaqualone hydrochloride contains methaqualone, the State failed to prove a necessary element of the offense beyond a reasonable doubt.

The State's expert witness was Kenneth Saito, a "criminalist" employed by the Hawaii County Police Department. He testified that he had analyzed portions of the contents of two of the fifteen capsules Officer Mathison had purchased from Mata. He first examined the capsules and identified them, by reference to the *Physician's Desk Reference,* as 400 milligram capsules manufactured by Parke-Davis. He performed several tests on the contents of the capsules. The first, a micro-crystal test, uses a chemical reagent. The reagent used, in this case potassium permanganate, was mixed with a sample of the capsule contents, allowed to set, and then viewed under a microscope to see if a particular type of crystal formed. He also did the same kind of test on "the standard that we use". In this case, he used "a methaqualone standard". The methaqualone standard used in this case came from Theta Corporation, a mainland company.

Mr. Saito "confirmed" the standard through an ultraviolet spectrophotometer scanning process. Depending on the type of compound being tested, particular types of peaks and characteristic curves appear. State's Exhibit 6 was Mr. Saito's chart on a standard of methaqualone, and referring to the chart he testified "[i]n the case of methaqualone, you get a peak like this. (Indicating.)" The test run on the standard serves two purposes: it "confirms" the standard and also gives a graph with which the graph of the unknown substance can be compared. Mr. Saito testified that he had in fact checked the standard in this case and that it conformed to methaqualone hydrochloride.

State's Exhibit 7 was the chart resulting from the ultra-violet scanning of the capsule contents. Mr. Saito testified that he "got the same characteristic peaks" and that the contents of the capsules tested contained methaqualone hydrochloride.

In a criminal prosecution, the State must prove every element of the offense charged beyond a reasonable doubt. *State v. Bannister*, 60 Haw. 658, 594 P.2d 133 (1979). A criminal case may be proven beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence. *State v. Murphy*, 59 Haw. 1, 575 P.2d 448 (1978). On appeal, the test to ascertain the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact, whether judge or jury. *State v. Hopkins*, 60 Haw. 683, 685, 592 P.2d 810, 811 (1979).

Here, the expert witness testified that he used a methaqualone standard, a standard he actually confirmed, and that the standard conformed to methaqualone hydrochloride. He also testified that the chart of the capsule contents had "the same characteristic peaks" as the standard and that the capsules contained methaqualone hydrochloride. We hold that there is substantial evidence on the record to support the conclusion of the trier of fact that the capsules contained methaqualone.

Affirmed.

*Steven K. Christensen* for defendant-appellant.

*Stanford H. Masui,* first deputy prosecuting attorney, County of Hawaii, for plaintiff-appellee.