928 P.2d 1

STATE of Hawai'i, Plaintiff–Appellee,

v.

Lael E. SAMONTE, Defendant–Appellant.

No. 17951.

Supreme Court of Hawai'i.

Nov. 26, 1996.

508

Sarah Courageous, on the briefs, Honolulu, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., KLEIN, NAKAYAMA and RAMIL, JJ. and Circuit Judge HIRAI, in place of LEVINSON, J., Recused.

NAKAYAMA, Justice.

At the conclusion of his third jury trial, defendant-appellant Lael Samonte (Samonte) was found guilty of attempted manslaughter by reckless conduct in violation of Hawai‘i Revised Statutes (HRS) § 705–500 (1985) and HRS § 707–702(1)(a) (1993), attempted murder in the first degree in violation of HRS § 705–500 and HRS § 707–701(1)(b) (1993), felon in possession of a firearm in violation of HRS § 134–7(b) (1985), and felon in possession of ammunition in violation of HRS § 134–7(b). On appeal, Samonte raises forty-seven points of error through his opening brief and supplemental brief, and after reviewing all forty-seven points of error, we directly address the following seven points in this opinion: (1) Samonte's motion to dismiss for violation of Hawai‘i Rule of Penal Procedure (HRPP) Rule 48; (2) the use of a partially anonymous jury; (3) alleged jury taint; (4) the State of Hawai‘i's use of an expert witness with respect to firearms and ammunition; (5) the trial court's admission into evidence of a redacted judgment document containing one of Samonte's previous felony convictions resulting from his plea of nolo contendere; (6) Samonte's conviction for

attempted manslaughter by reckless conduct; and (7) Samonte's sentence. We affirm the trial court's denial of Samonte's motion to dismiss for violation of HRPP Rule 48, we affirm Samonte's conviction and sentence for the attempted murder in the first degree of Police Officer Herman Cauton, we vacate and remand Samonte's conviction for the lesser included offense of the "attempted manslaughter by reason of reckless conduct" of Anita Ancheta and Glenn Ancheta, we vacate Samonte's two twenty-year imprisonment terms for felon in possession of a firearm and felon in possession of ammunition and remand for resentencing, and we affirm all of the trial court's rulings with respect to the remaining issues in Samonte's forty-seven points of error.

## I. BACKGROUND

On January 4, 1989, plaintiff-appellee State of Hawai'i (prosecution) indicted Samonte for the following offenses: two counts of attempted murder in the first degree; three counts of attempted murder in the second degree; one count of reckless endangering in the second degree; two counts of kidnapping; one count of felon in possession of a firearm; one count of felon in possession of ammunition; and one count of assault in the third degree. On April 1, 1991, a jury found Samonte guilty of two counts of attempted murder in the first degree, two counts of unlawful imprisonment in the second degree, felon in possession of a firearm, and felon in possession of ammunition. By the time Samonte was sentenced he had been represented in turn by four different attorneys due to various reasons. The trial court sentenced Samonte to the following: two concurrent terms of life imprisonment without the possibility of parole for the two counts of attempted murder in the first degree; one year imprisonment for each of the two counts of unlawful imprisonment in the second degree; ten years imprisonment for felon in possession of a firearm, with a mandatory minimum term of three years and four months; ten years imprisonment for felon in possession of ammunition, with a mandatory minimum term of three years and four months. All terms were to run concurrently. However, on appeal in Supreme Court of Hawai'i Case Number 15720, we issued an order on July 16, 1992, vacating and remanding Samonte's judgment of conviction for a new trial pursuant to our holding in State v. Echineque, 73 Haw. 100, 828 P.2d 276 (1992), reconsideration denied, 73 Haw. 625, 832 P.2d 1129 (1992).

On January 20, 1993, Samonte's second trial commenced, but due to jury tampering the trial court granted Samonte's motion for a mistrial on March 10, 1993. Samonte moved for a change in venue, which the trial court denied. Samonte's counsel moved for withdrawal as counsel, which the trial court denied. Subsequently, Samonte's counsel told the trial court he was not able to proceed with trial because he had scheduled a vacation and, as a result, the trial date was delayed. On the day when trial was set to commence, Samonte's counsel moved for withdrawal as counsel for the second time, alleging that Samonte had threatened him. Samonte joined in the motion, alleging that his counsel was responsible for the jury tampering that had led to the previous mistrial. After informing Samonte that his motion would result in a delay in the scheduling of his third trial, the trial court granted the motion. Shortly thereafter, Samonte's newly appointed counsel moved for a continuance, which the trial court granted. On January 11, 1994, Samonte moved for dismissal for violation of HRPP Rule 48, which the trial court denied.

Samonte's third trial commenced on January 20, 1994. Due to the past problems in this case with jury tampering, the trial court ordered that first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers be blocked out from the jury lists and jury information cards provided to the parties for jury voir dire.

At this trial Glenn Ancheta (Glenn) and his mother, Anita Ancheta (Mrs. Ancheta) both testified about the events leading to Samonte's arrest. On December 27, 1988, Glenn was living with his parents at 94–838 Kumukula Street in the City and County of Honolulu with his parents, Adolfo and Anita

Ancheta, his brother, Kenneth, his sister, Gloria, and Gloria's boyfriend, Samonte. At about 9:30 a.m., Mrs. Ancheta heard a "click," turned around and saw Samonte pointing a rifle at her. Mrs. Ancheta rushed into Glenn's bedroom, shut the door and told Glenn to telephone the police. Samonte pounded on the bedroom door, angrily yelled profanities and told them to open the door before everybody in the house died. When Glenn opened the door, he saw Samonte pointing a rifle at both of them. Samonte asked where Glenn's sister, Gloria, was. Samonte told them to find Gloria or else he would kill everyone in the house. Glenn pretended to make several telephone calls in order to look as though he was trying to call his sister. However, Glenn was eventually able to telephone the police.

When police officers arrived, Glenn was able to shut the bedroom door and hold it shut. Both Glenn and Mrs. Ancheta stood with their backs to the door. Standing in the hall outside of the bedroom, Samonte yelled more profanities. Mrs. Ancheta heard two shots from behind the door and, when she looked back, she saw two bullet holes in the door. The bullet holes in the door were right above Glenn's head. As more shots were fired, Glenn and Mrs. Ancheta ran out to a balcony and climbed over a railing onto a ledge, from which police officers later helped them climb down.

Honolulu Police Department (HPD) Officer Herman Cauton (Officer Cauton) testified that he was the first police officer to arrive at 94–838 Kumukula Street, where he heard shots being fired and a woman screaming. Officer Cauton saw a male and a female come out onto the second floor balcony. Officer Cauton tried to open a front door to the house, which had a transparent plastic panel through which a person inside the house could see who was standing in front of the door. Officer Cauton could not open the door, and yelled loudly, "The door's locked." Five seconds later, Officer Cauton moved to the side of the door and he suddenly heard three shots and saw projectiles and wood splinters exit outward from the door at about his chest level. Police officers eventually arrested Samonte.

HPD Evidence Specialist Errol Kilangtang (Kilangtang) testified that, on December 27, 1988, he reported to 94–838 Kumukula Street where he took pictures and recovered lead fragments, cartridges, spent casings, and wood splinters. Kilangtang also recovered a loaded .22 caliber rifle that was leaning against a chair on the second floor. Mrs. Ancheta testified that on December 27, 1988, a police detective had shown her the rifle that police had recovered after the incident, and Mrs. Ancheta stated that she was able to identify the rifle as the weapon that Samonte had used during the incident.

The prosecution called HPD Criminologist Judith Christensen (Christensen) as an expert witness to testify whether spent casings from the scene of the crime had been fired from the recovered rifle. Christensen testified that she test-fired two cartridges from the rifle that police had recovered from the house. The first cartridge fired properly, but the second cartridge jammed. Upon examining the striation patterns on the casings, Christensen concluded that the casing she had fired matched six casings that police had recovered from the house. Christensen also used a .22 rifle to test-fire one of five cartridges that police had found at the scene of the crime, and she concluded that the cartridge constituted live ammunition.

In order to prove that Samonte was a convicted felon at the time he possessed a firearm and ammunition, the prosecution introduced into evidence a redacted copy of a judgment document from Criminal No. 6064, indicating that "IT IS ADJUDGED that [Samonte] has been convicted of and is guilty of the offense of ... BURGLARY IN THE FIRST DEGREE[,]" a conviction that had been based upon Samonte's plea of nolo contendere. The prosecution also submitted to the trial court for identification a certified copy of the full judgment in Criminal No. 6064 convicting Samonte of a total of twenty offenses, including the conviction for burglary in the first degree. However, only the redacted judgment of conviction was submitted to the jury as evidence.

The prosecution presented the testimony of John Tam, who, as a deputy prosecutor for the County of Maui, had handled the prose-

cution of Samonte in Criminal No. 6064 for, among a total of twenty counts, the offense of burglary in the first degree. Tam identified Samonte as the person to whom the redacted judgment of conviction for burglary in the first degree referred, and furthermore, Tam testified that Samonte had been represented by counsel during that particular criminal proceeding.

Various other witnesses, including Samonte, testified, after which the trial court instructed the jury. The trial court instructed the jurors that attempted manslaughter by reason of extreme mental or emotional disturbance, "attempted manslaughter by reason of reckless conduct," and reckless endangering in the second degree were lesser included offenses of attempted murder in the first degree.

During deliberations, the trial court was informed that two jurors had received letters directing the jurors to find Samonte guilty. The trial court questioned the two jurors individually and instructed them not to discuss the letters with other jurors. The two jurors assured the trial court that they could continue to be fair and impartial for the remainder of the trial. The trial court then reconvened with the entire jury and asked all of the jurors whether they had received any outside communications, and no jurors responded in the affirmative.

The trial court also discovered that a juror (Juror A) had discussed with another juror (Juror B) mention made by defense counsel of the area in which Juror A lived, and that Juror A was scared. The trial court spoke with each of the two jurors individually, and they assured the trial court that they could continue to be fair and impartial for the remainder of the deliberations and trial.

At one point Samonte informed the court that a prospective juror, who was not a member of the jury, told Samonte that she had telephoned one of the jurors and discussed the case with the juror. However, when the trial court asked the jurors whether any of them had received any outside communications, no jurors responded in the affirmative.

Before the jury concluded its deliberations, the prosecution moved to nolle prosequi the two counts of unlawful imprisonment in the second degree. After deliberating, the jury rendered the following guilty verdicts: guilty of the lesser included offense of "attempted manslaughter by reason of reckless conduct" with respect to Glenn and Mrs. Ancheta; guilty of attempted murder in the first degree with respect to Officer Cauton; guilty of felon in possession of a firearm; and guilty of felon in possession of ammunition. The trial court sentenced Samonte as follows: an extended term of twenty years for the "attempted manslaughter by reason of reckless conduct" of Glenn and Mrs. Ancheta; life imprisonment without the possibility of parole for the attempted murder in the first degree of Officer Cauton; an extended term of twenty years imprisonment for felon in possession of a firearm; and an extended term of twenty years imprisonment for felon in possession of ammunition. All terms were to run concurrently.

Samonte's timely appeal followed.

## II. *DISCUSSION*

Samonte has raised forty-seven points of error through his opening brief and a supplemental brief. We affirm the trial court's denial of Samonte's motion to dismiss for violation of HRPP Rule 48, we affirm Samonte's conviction and sentence for the attempted murder in the first degree of Officer Cauton, we vacate and remand Samonte's conviction for the lesser included offense of the "attempted manslaughter by reason of reckless conduct" of Glenn Ancheta and Anita Ancheta, we vacate Samonte's two twenty-year terms of imprisonment for felon in possession of a firearm and felon in possession of ammunition and remand for resentencing, and we affirm all of the trial court's rulings with respect to the remaining issues in Samonte's forty-seven points of error.

### A. *Motion to Dismiss for Violation of HRPP Rule 48*

Samonte contends that the trial court erred by denying his motion to dismiss the charges against him for violation of HRPP Rule 48. We disagree.

"HRPP Rule 48(b) mandates the dismissal of criminal charges if a trial on those charges does not commence within six months, construed as one hundred eighty days, from the time of arrest or of filing of charges, whichever is sooner." *State v. Jackson,* 81 Hawai'i 39, 50, 912 P.2d 71, 82 (1996). After a mistrial, "the court shall, on motion of the defendant, dismiss the charge, with or without prejudice in its discretion, if trial is not commenced within six months ... from the date of mistrial[.]" HRPP Rule 48(b)(3).

When reviewing a trial court's denial of an HRPP Rule 48 motion to dismiss, we apply both the "clearly erroneous" and "right/wrong" tests:

> A trial court's findings of fact (FOFs) in deciding an HRPP 48(b) motion to dismiss are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed. However, whether those facts fall within HRPP 48(b)'s exclusionary provisions is a question of law, the determination of which is freely reviewable pursuant to the "right/wrong" test.

*State v. Hutch,* 75 Haw. 307, 328–29, 861 P.2d 11, 22 (1993) (citations, internal quotation marks and brackets omitted).

Pursuant to HRPP 48(c), certain periods must be excluded from the computation of the one hundred eighty day period, including delays resulting from: "collateral or other proceedings concerning the defendant, including but not limited to ... hearings pretrial motions," (HRPP Rule 48(c)(1)); "a continuance granted at the request or with the consent of the defendant or his counsel[,]" HRPP Rule 48(c)(3); and "other periods of delay for good cause." HRPP Rule 48(c)(8). It is also instructive that, effective December 5, 1994, we amended HRPP 48 so that it would more clearly specify those periods that are per se excludable, including the following:

**(d) Per See Excludable and Includable Periods of Time for Purposes of Subsection (c)(1) of this Rule.**

(1) For purposes of subsection (c)(1) of this rule, the period of time, from filing through the prompt disposition of the following motions filed by a defendant, shall be deemed to be periods of delay resulting from collateral or other proceedings concerning the defendant: motions ... *for withdrawal of counsel, ... to continue trial,* ... [and] *for change of venue* [.]

HRPP Rule 48(d)(1) (emphases added). "HRPP Rule 48 makes clear that the enumerated periods of excludable time set forth in subsection (c) apply only to events and circumstances that cause a 'delay' in the commencement of trial." *Jackson,* 81 Hawai'i at 52, 912 P.2d at 84. "[I]n computing the time within which the trial of [the] defendant must commence, any delay resulting from any pretrial motion concerning the defendant shall be excluded from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." *State v. Soto,* 63 Haw. 317, 320, 627 P.2d 279, 281 (1981).

On March 10, 1993, the trial court granted Samonte's motion for a mistrial in his second trial, and, three hundred and seven days later in his subsequent third trial, on January 11, 1994, Samonte filed his motion to dismiss charges for violation of HRPP Rule 48. Subtracting one hundred eighty-seven excludable days from the three hundred and seven days that had passed, the trial court concluded that only one hundred twenty days were nonexcludable and denied Samonte's motion. In its findings of fact and conclusions of law, the trial court stated in pertinent part:

2. Defendant's Motion for Mistrial was granted on March 10, 1993;

3. Pursuant to Rule 48(b)(3), *H.R.P.P.,* the six-month time limitation begins to run anew from the date of mistrial;

4. The instant motion was filed on January 11, 1994;

5. Three hundred seven (307) days have lapsed from the date of mistrial to the date the Rule 48 Motion was filed;

6. One hundred eighty seven (187) days are excludable as follows:

a. Defendant's Motion to Withdraw As Counsel was filed on June 23, 1993 and granted [sic] on June 28, 1993. Six (6) days is excluded under Rule

48(c)(1). *State v. Soto*, 63 Haw. 317, 627 P.2d 279 (1981).

b. Defendant's Motion to Change Venue was filed on March 30, 1993, and denied on June 21, 1993. Eight-four [sic] (84) days is excludable under Rule 48(c)(1). *State v. Soto*, 63 Haw. 317, 627 P.2d 279 (1981).

c. On September 7, 1993, Defendant joined in his counsel's oral motion to withdraw. Defendant was advised that a withdrawal of counsel would result in a delay of his trial. A new trial date of January 3, 1994, was set pursuant to Defendant's subsequent Motion to Continue. The time period from September 27, 1993 to January 3, 1994 amounting to ninety-seven (97) days is excluded from the running of the Rule 48 time limitation.

7. Three hundred seven days (307) have elapsed, but with the one hundred eighty-seven (187) excludable days, there remains one hundred twenty (120) days chargeable to the State. Accordingly, there are sixty (60) days under Rule 48, *H.R.P.P.* in which to proceed to trial in this matter.

ACCORDINGLY IT IS HEREBY ORDERED that the Motion to Dismiss Charges for Violation of Rule 48, *H.R.P.P.*, be and the same is hereby denied.

As stated, the trial court noted four of Samonte's motions that had tolled the one hundred eighty day time limit for the commencement of his trial under HRPP Rule 48: (1) a motion to change venue, (2) a motion to withdraw as counsel, (3) a second motion to withdraw as counsel, and (4) a motion to continue the trial. The trial court apparently combined the tolled time periods for (3) the second motion to withdraw counsel with (4) the motion to continue trial, and added all the days between the two. For the sake of brevity, however, we note that merely three of these motions, taken individually, created a sufficient amount of excludable time to preclude Samonte from prevailing in his motion to dismiss under HRPP Rule 48.

■ First, on March 30, 1993, Samonte filed a motion to change venue. Although Samonte's third trial was scheduled for June 1, 1993, the trial could not commence until the resolution of Samonte's motion to change venue, which was not adjudicated until June 21, 1993. Eighty-four days passed before the motion to change venue was eventually adjudicated. Therefore, these eighty-four days were excludable as "periods of delay resulting from ... hearings on pretrial motions[.]" HRPP Rule 48(c)(1).

■ Second, on September 27, 1993, Samonte joined in his counsel's oral motion to withdraw as counsel, and, after warning Samonte that granting the motion would result in a delay of his trial, the trial court granted Samonte's motion.[1] We have held that "de-

---

1. On October 13, 1993, the trial court issued the following findings of fact, conclusions of law, and order granting Samonte's oral motion to withdraw counsel, in pertinent part:

2. Wayne Rooney, Esq. is Defendant's fourth attorney in the above-referenced criminal matter;

3. Mr. Rooney represented in open court that Defendant threatened him in the cellblock area;

4. Mr. Rooney called Myles Breiner, Esq. as a witness to confirm the alleged threat;

5. Defendant claims that Mr. Rooney confessed to him that he (Rooney) is responsible for the jury tampering in the instant case;

6. Defendant agreed that he never mentioned the alleged tampering by Mr. Rooney until the oral motion to withdraw on September 27, 1993;

7. *Defendant was apprised that a withdrawal and substitution of new counsel would result in a delay of the trial in this case;*

8. Defendant was apprised that he would remain in jail until the next trial of this case as any judge would be hesitant to reduce his bail in light of the severity of these charges;

9. *The State of Hawaii was ready to proceed with trial on September 27, 1993 when the oral motion to withdraw as counsel was granted;*

10. *Because new counsel is to be appointed, and this is a complex case, trial could not proceed on September 27, 1993 as planned.*

11. Because of Defendant's decision to obtain new counsel, and the necessary delay in the trial as a result thereof, *Rule 48, Hawaii Rules of Penal Procedure and speedy trial are tolled from September 27, 1993 until jury selection begins at the next trial.* The aforementioned period of delay is attributable to the Defense, and is excluded under Rule 48(c)(8), H.R.P.P.

ACCORDINGLY IT IS HEREBY ORDERED that the oral motion to withdraw as counsel be and same is hereby granted.

fense counsel's motion to withdraw as counsel was excluded under Rule 48(c)(1) as a pretrial motion concerning the defendant." *State v. Senteno*, 69 Haw. 363, 368, 742 P.2d 369, 373 (1987). Furthermore, when the trial court granted the defendant's motion and left the defendant without counsel for a time period, we have held that, "[b]ecause trial could not proceed in the absence of trial counsel or a waiver of the right to counsel, this period was excludable under the 'good cause' provision of subsection (c)(8) [of HRPP 48]." *Id.* Samonte was without counsel until September 30, 1993, when the trial court appointed George Parker III (Parker) as counsel for Samonte. Therefore, Samonte's joinder in his attorney's oral motion to withdraw as counsel resulted in a total of at least four excludable days.

■ Third, on November 19, 1993, as Samonte's newly appointed counsel, Parker, filed a motion to continue trial and extend the pretrial motions deadline. On December 9, 1993, the trial court granted the motion, and set trial for January 3, 1994.[2] We toll "periods of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel[.]" HRPP Rule 48(c)(3); *see State v. Miller*, 4 Haw.App. 603, 671 P.2d 1037 (1983) (holding that a defendant's self-initiated continuance period was an excluded period for the purpose of calculating whether a trial had commenced within the six month time limit of HRPP Rule 48); *State v. Mata*, 1 Haw.App. 31, 613 P.2d 919 (1980) (holding that a continuance, consented to by a defendant, constituted a period which was excluded for the

purpose of calculating whether a trial had commenced within the six month time limit of HRPP Rule 48). Thus, Samonte's motion to continue trial resulted in a total of forty-six excludable days.

The total excludable days resulting from these three individual motions was one hundred and thirty-four days. Subtracting the one hundred thirty-four excludable days from the total of three hundred seven days that had passed since Samonte's mistrial, we conclude that, at the most, one hundred seventy-three days were non-excludable under HRPP Rule 48.[3] The trial court was therefore correct in denying Samonte's motion to dismiss for violation of HRPP Rule 48.

Accordingly, we affirm the trial court's denial of Samonte's motion to dismiss for violation of HRPP Rule 48.

### B. *Partially Anonymous Jury*

■ Samonte contends that the trial court violated his federal and state constitutional right to a fair and impartial jury by ordering that the first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers be blocked out from the jury lists and jury information cards. We disagree.

The trial court granted the prosecution's motion for jury anonymity after determining that two jurors in Samonte's second trial had been contacted by anonymous persons, which had resulted in a mistrial:

(Emphasis added).

**2.** On December 9, 1993, the trial court issued the following findings of fact, conclusions of law, and order granting the motion to continue trial:

1. Defense counsel George Parker III was recently appointed;
2. This is a complex case, and *Mr. Parker has represented that he is not ready to proceed with trial;*
3. Rule 48, *H.R.P.P.* is tolled from the date of Mr. Parker's appointment until January 3, 1994, inclusive.

ACCORDINGLY IT IS HEREBY ORDERED that the Motion to Continue Trial and Extend the Pretrial Motions Deadline be and the same is hereby granted to the week of *January 3, 1994.*

(Emphasis added).

**3.** If we would hold that the trial court was correct in finding that the one hundred eighty day limit under HRPP Rule 48 was tolled from the date of Samonte's joinder in his counsel's oral motion to withdraw as counsel on September 27, 1993, until the trial date of January 3, 1994, then the prosecution would have an additional forty-nine days of leeway. However, we need not reach this particular issue, because the record otherwise shows that there were enough otherwise excludable days to preclude Samonte from prevailing in his motion to dismiss for violation of HRPP Rule 48.

1. The court takes judicial notice of the records, files, and the trial proceedings in the instant case;

2. The retrial of the instant case occurred from January 20, 1993 to March 10, 1993, inclusive;

3. Said retrial ended in a mistrial after the State rested;

4. Two jurors in said retrial were contacted by anonymous individuals, resulting in a taint of said jurors;

5. Said tampering resulted in jury attrition and an inadequate number of jurors to complete the case;

6. If ever there were a case that warranted jury anonymity, this is the case. Anonymity is needed to protect the jury, the State and the Defense;

ACCORDINGLY IT IS HEREBY ORDERED that Motion for Jury Anonymity be and the same is hereby granted. The names, signatures, home telephone numbers, business telephone numbers, street number and apartment number of each prospective juror shall be stricken from the jury cards. The name of the street in which [sic] each juror lives without the street number, and the general area in which they live will be allowed.

The trial court subsequently modified this order, however, so that the jurors would not be completely anonymous. The modified order stated in pertinent part as follows:

4. Accordingly, both parties shall be given the following from the juror information cards:

a. only the last names of the prospective jurors;

b. the name of the street that each prospective jurors [sic] resides at minus the exact street/apartment number[;]

c. the occupation of each prospective juror;

d. the marital status/number of children of each prospective juror;

e. the number of years of education that each prospective juror has completed;

f. the town and zip code in which each prospective juror resides;

g. the date of birth/number of years of residence in the state, and on the island of Oahu for each prospective juror.

5. Both parties shall also be privy to the jurors' responses to the following questions contained on the juror information cards:

a. Are you a U.S. citizen?

b. Have you ever been convicted of a crime punishable by imprisonment for more than one year and not pardoned by the governor? If yes, what year?

c. Do you claim to be disqualified or exempt from jury service? If yes, please indicate the disqualification or exemption you are claiming.

d. Are there other reasons why you should not serve as a juror? Please specify.

e. Have you served as a juror? If yes, what year? Which court?

f. Have you or any member of your immediate family been a party to a law suit?

g. Has a claim for personal injury ever been made against you or have you ever made a claim for personal injury?

h. Are you related to or close friends with any law enforcement officer?

i. The prospective juror is unable to fill out this form because

---

HRS § 612–18(c) (1993) provides that "[t]he names [4] of prospective jurors to be summoned to sit as a jury, and the contents of juror qualification forms [5] completed by

**4.** The word "name," "when used in connection with prospective jurors, includes identifying numbers of the jurors." HRS § 612–3 (1993).

**5.** HRS § 612–13(a) (1993) states, in pertinent part, that a juror qualification form must contain the following information:

The form shall be subject to the approval by the court as to matters of form and shall elicit the name, address of resident, age of the prospective juror, other information pertinent to disqualification or exemption from jury service, and such other matters as may be ordered by the court. The form shall also con-

those jurors, *shall* be made available to the litigants concerned." (Emphasis added). Although HRS § 612–18(c) contains the word "shall," "[t]he use of the word 'shall' in the statute is not dispositive of the issue of whether the statute is mandatory rather than directory." *Jack Endo Electric, Inc. v. Lear Siegler, Inc.,* 59 Haw. 612, 616, 585 P.2d 1265, 1269 (1978). "[W]hile the word 'shall' is generally regarded as mandatory, in certain situations it may be given a directory meaning." *State v. Himuro,* 70 Haw. 103, 105, 761 P.2d 1148, 1149 (1988); *Matter of Fasi,* 63 Haw. 624, 626, 634 P.2d 98, 100–01 (1981); *Jack Endo Electric, Inc.,* 59 Haw. at 616, 585 P.2d at 1269. "A crucial difference between statutes considered directory and those deemed mandatory arises from the consequences of noncompliance. A failure to follow the former is *un* attended by serious legal consequences; a neglect of the latter may invalidate a transaction or subject the transgressor to legal liabilities." *Perry v. Planning Comm'n of the County of Hawai'i,* 62 Haw. 666, 676, 619 P.2d 95, 103 (1980) (emphasis added). "In determining whether a statute is mandatory or directory the intention of the legislature must be ascertained." *Jack Endo Electric, Inc.,* 59 Haw. at 617, 585 P.2d at 1269. "Courts are not controlled by the literal meaning of the law in arriving at the intention of the legislature." *State v. Brantley,* 147 Ga.App. 569, 249 S.E.2d 365, 367 (1978) (citation omitted). "Where the directions of a statute are given merely with a view to the proper and orderly conduct of business, or relate to some immaterial matter, concerning convenience rather than substance, it is generally regarded as directory." *Miller v. State,* 94 Okla.Crim. 198, 232 P.2d 651, 658 (App.1951) (citation and quotation marks omitted). Furthermore, "a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them." *Jack Endo*

*Electric, Inc.,* 59 Haw. at 617, 585 P.2d at 1269.

The legislature's purpose of enacting HRS Chapter 612 was "to provide a comprehensive law relating to the jury selection system and the utilization of jurors." Stand. Comm. Rep. No. 542, in 1973 House Journal at 996; Stand. Comm. Rep. No. 754, in 1973 Senate Journal at 943. The legislature has stated its policy with respect to HRS Chapter 612 as follows:

§ 612–1 **Declaration of policy.** It is the policy of this State that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity in accordance with this chapter to be considered for jury service in this State and an obligation to serve as jurors when summoned for that purpose.

HRS § 612–1 (1993).

█ The legislature did not state its purpose for specifically requiring that the names of prospective jurors and the contents of juror qualification forms "shall be made available to the litigants concerned." HRS § 612–18(c). However, in determining whether a statute is mandatory or directory, we may determine the intention of the legislature from "a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other." *Jack Endo Electric, Inc.,* 59 Haw. at 617, 585 P.2d at 1269 (citation and quotation marks omitted).

█ In consideration of HRS Chapter 612 as a whole, its nature, its object, and the consequences that would result from construing HRS § 612–18(c) one way or the other, we conclude the legislature enacted HRS § 612–18(c) for two primary reasons. First, a criminal defendant has a constitutional right to a presumption of innocence. "An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to

tain the prospective juror's declaration that the prospective juror's responses are true to the best of the prospective juror's knowledge and the prospective juror's acknowledgment that a

wilful misrepresentation of a material fact may be punished by a fine of not more than $500 or imprisonment for not more than thirty days, or both.

a presumption of innocence." *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995).

■ Second, a criminal defendant has a constitutional right to an impartial jury.[6] "We are ... mindful of the fact that juror anonymity denies a defendant information that might be helpful in the exercise of his or her right to utilize peremptory challenges during voir dire." *United States v. Edmond,* 52 F.3d 1080, 1090 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995).

■ Therefore, because we conclude that the purpose of HRS § 612–18(c) is to uphold a criminal defendant's constitutional guarantees of a presumption of innocence and an impartial jury, the issue of whether the word "shall" in HRS § 612–18(c) is "directory" or "mandatory" hinges upon whether a trial court's mere "directory" construction of the word "shall" in HRS § 612–18(c) would lose, destroy, or sacrifice a criminal defendant's constitutional right to a presumption of innocence and an impartial jury. *Cf. Perry,* 62 Haw. at 677, 619 P.2d at 103 ("the word "shall" may be held to be merely directory when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to the individual, by giving it that construction") (quoting *Wisdom v. Board of Supervisors,* 236 Iowa 669, 19 N.W.2d 602, 608 (1945)) (quotation marks omitted).

The trial court in the instant case obviously interpreted the word "shall" in HRS § 612–18(c) as "directory" rather than "mandatory," because, in an apparent contradiction to HRS § 612–18(c), the trial court did *not* make the first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers available to the defendant. Therefore, we must answer the question of whether the trial court lost, destroyed or sacrificed Samonte's constitutional

right to a presumption of innocence and an impartial jury by ordering that the first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers be redacted from the jury lists and jury information cards before disbursement to the parties.

At least five federal circuit courts have held that it is not unconstitutional for trial courts to empanel anonymous juries when it was necessary to protect the integrity of the jury's decision making process. *Edmond,* 52 F.3d 1080, 1090–94; *Ross,* 33 F.3d 1507, 1519–22; *United States v. Crockett,* 979 F.2d 1204, 1215–17 (7th Cir.1992), *cert. denied,* 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993); *United States v. Scarfo,* 850 F.2d 1015, 1021–26 (3d Cir.1988), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Barnes,* 604 F.2d 121, 140–41 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *cf. In re Baltimore Sun Co.,* 841 F.2d 74, 76 n. 5 (4th Cir.1988) (ordering release of juror names to a newspaper, but emphasizing that "we do not deal here with a situation in which there existed realistic threats of violence or jury corruption"); *Johnson v. United States,* 270 F.2d 721, 724 (9th Cir.1959) (affirming a district court's refusal of defendant's request for the exact address of each juror), *cert. denied,* 362 U.S. 937, 80 S.Ct. 759, 4 L.Ed.2d 751 (1960).

■ Although empaneling an anonymous jury might potentially infringe upon the constitutional rights of a criminal defendant, "neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and courtroom security as long as steps are taken to ensure that the defendant receives a fair trial." *Edmond,* 52 F.3d at 1090. "Accordingly, the decision to impanel an anonymous jury requires a court to balance the defendant's interest in conducting meaningful voir dire

---

**6.** A criminal defendant has a right to an impartial jury in state court through the sixth and fourteenth amendments of the United States

Constitution, as well as article I, section 14 of the Hawai'i State Constitution.

and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *Id.* (quoting in part *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994)) (quotation marks omitted). Federal courts have generally utilized the following test in order to determine whether a trial court has been correct in empaneling an anonymous jury:

> In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe that the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected. Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion.

*United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991) (citations omitted), *cert. denied*, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).[7]

### 1. Did the trial court have a strong reason to believe that the jury needed protection?

■ With respect to the first element of the anonymous jury test, the trial court reasonably concluded that there was strong reason to believe that the jury needed protection.

> Sufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with judicial

process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility the jurors' names would become public and expose them to intimidation or harassment.

*Ross*, 33 F.3d at 1520.

While the first two factors do not seem to apply to the instant case, the third factor, i.e., interference with judicial process, is applicable in that someone had attempted to interfere with the judicial process in Samonte's case. When the trial court granted the prosecution's motion for jury anonymity, the trial court specifically found that two jurors in Samonte's second trial had been contacted by anonymous persons, which resulted in a mistrial. In those two separate instances of jury tampering during the second trial, "local-sounding" anonymous callers had telephoned two of the jurors and had instructed the jurors, in effect, to find Samonte guilty. When the trial court in the second trial investigated the jury contacts, Samonte himself claimed that the State of Hawai'i had been involved with the anonymous telephone calls. Thus, while the trial court in the subsequent third trial did not necessarily find that Samonte had attempted to interfere with the judicial process during the second trial, the trial court in the third trial specifically found that an anonymous jury was needed for the protection of the jury, the prosecution, and Samonte himself. *See United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir.1995) ("[W]e conclude that [the defendant]'s due process rights were not violated even in the absence of evidence that he in particular had sought to obstruct justice.").

The fourth factor, i.e., the potential that the defendant could suffer a lengthy incarceration and substantial monetary penalties, also applies to the instant case because there

---

7. When reviewing a trial court's decision that a criminal defendant will not be provided with the names of prospective jurors and the contents of juror qualification forms under HRS § 612–18(c), we will not reverse or vacate the trial court's decision unless we conclude that the trial court has abused its discretion. *Cf. Ross*, 33 F.3d at 1519 (reviewing a trial court's decision to empanel an anonymous jury pursuant to the

abuse of discretion standard); *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir.1993) (reviewing a trial court's decision to empanel an anonymous jury pursuant to the abuse of discretion standard), *cert. denied*, 510 U.S. 982, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993); *Paccione*, 949 F.2d at 1192 (reviewing a trial court's decision to empanel an anonymous jury pursuant to the abuse of discretion standard).

was potential that, if convicted, Samonte would suffer a lengthy incarceration. For example, the prosecution charged Samonte with, among other things, attempted murder in the first degree, for which Samonte, if convicted, would receive a sentence of "life imprisonment without possibility of parole." HRS § 706–656(1) (1993).

Finally, the fifth factor applies to the instant case, i.e., that extensive publicity could enhance the possibility that the jurors' names would become public and expose them to intimidation or harassment. The record shows that, throughout the duration of this case, both the prosecution and Samonte voiced their concerns to the trial court that this case was receiving extensive publicity through the news media, particularly because Samonte was receiving his third trial after having accused the State of Hawai'i of tampering with jurors.

Therefore, with respect to the first element of the two part test for empaneling an anonymous jury, the trial court reasonably concluded that there was strong reason to believe the jury, Samonte and the prosecution needed the protection of a partially anonymous jury.

2. *Did the trial court take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights were protected?*

With respect to the second element of the test governing the empanelment of an anonymous jury, we hold that the trial court took reasonable steps to minimize any prejudicial effects that the anonymous jury might have on Samonte and to protect Samonte's fundamental rights. First, we note that, although the trial court ordered that first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers be redacted from the jury lists and jury information cards, the trial court did not prohibit the parties from inquiring about general aspects of the jurors' personal backgrounds that were unrelated to the jurors' personal identity.

For example, the trial court allowed the parties to know the last names of the prospective jurors, the name of the street on which each prospective juror resided without the exact street or apartment number, the occupation of each prospective juror, the marital status and number of children of each prospective juror, the number of years of education that each prospective juror had completed, the town and zip code in which each prospective juror resided, the date of birth of each juror, and the number of years of residence in the state and on the island of Oahu for each prospective juror. And although the trial court did not allow the parties to know the identities of the jurors' employers, the trial court specifically informed both parties that they could make detailed inquiries about the nature of each juror's work:

> THE COURT: .... Now, one other point just to make it clear for Mr. Samonte's benefit, if he misunderstood, *the nature of the work* done by the jurors *can be inquired into and certainly should be.* It's only the specific identity of the employer that the Court has, at the request of the State, ordered not be disclosed. But the nature of the work, the—matter of fact, *the detailed nature of the work of the juror or—and the juror's spouse can certainly be inquired into.* ...

(Emphases added).

Furthermore, Samonte has not asserted that the trial court's redaction of certain personal information about the jurors prevented the parties from asking questions about the jurors' biases or prejudices related to the general issues in the case, the particular victims, or the pretrial publicity regarding Samonte. Where jury anonymity has been warranted, courts have "found the defendant's fundamental right to an unbiased jury is adequately protected by the court's conduct of a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself." *Paccione,* 949 F.2d at 1192 (quotation marks omitted) (quoting *United States v. Vario,* 943 F.2d 236, 242 (2d Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992) and *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.

1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980)); *see also, United States v. Wong,* 40 F.3d 1347, 1377 (2d Cir.1994) (holding that a voir dire exploring prospective jurors' bias as to issues in the case and as to defendants is adequate for the purposes of empaneling an anonymous jury), *cert. denied,* —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995).

We further conclude that Samonte was able to exercise peremptory challenges and conduct a thorough voir dire because the jury was not completely anonymous. For example, the parties knew the last names of the jurors. Moreover, other than referring to the limited information that was redacted from the jury cards, Samonte fails to offer any additional arguments as to why the voir dire in the instant case might have been inadequate.

Finally, with respect to Samonte's constitutional right to a presumption of innocence, before the jury began its deliberations, the trial court specifically instructed the jurors that they were to presume that Samonte was innocent:

> You must presume the defendant is innocent of the charge against him. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.
>
> The presumption of innocence is not a mere slogan but an essential part of the law that is binding upon you. It places upon the prosecution the duty of proving every material element of the offense charged against the defendant beyond a reasonable doubt.
>
> You must not find the defendant guilty upon a mere suspicion or upon evidence which only shows that the defendant is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but proof of the defendant's guilt beyond a reasonable doubt.
>
> . . . .
>
> The indictment is a mere formal accusation, and it is not evidence of the defendant's guilt. You must not be influenced

at all because the defendant has been charged with an offense(s).

> . . . .
>
> . . . . You must ... disregard any remark I may have made, unless the remark was an instruction to you.
>
> If I have said or done anything which has suggested to you that I am inclined to favor the claims or positions of either party, or if any expression or statement of mine has seemed to indicate an opinion relating to which witnesses are, or are not, worthy of belief or what facts are or are not established or what inferences should be drawn therefrom, I instruct you to disregard it.
>
> You must not be influenced by pity for the defendant or by passion or prejudice against the defendant. Both the prosecution and the defendant have a right to demand, and they do demand and expect, that you will conscientiously and dispassionately consider and weigh all of the evidence and follow these instructions, and that you will reach a just verdict.

Such instructions helped ensure that Samonte received the benefits of a presumption of innocence, notwithstanding what the jurors might have otherwise inferred from the empanelment of a partially anonymous jury.

■ When a trial court empanels an anonymous jury, we would normally prefer that the trial court address the burden that a completely anonymous jury imposes on a criminal defendant's presumption of innocence by the trial court's giving jurors an instruction that further minimizes the significance of their anonymity. The trial court should give anonymous jurors a plausible and nonprejudicial reason for not disclosing their identities that decreases the probability that the jurors would infer that the defendant is guilty or dangerous (e.g., the trial court could instruct the jurors that the purpose for juror anonymity is to protect the jurors from contacts by the news media, thereby implying that juror anonymity is not the result of threats from the criminal defendant). We do not know whether the trial court gave the jurors in the instant case such an instruction because the record does not contain a transcription of the voir dire. However, the fact

that the trial court might not have given the jury a plausible and nonprejudicial explanation for jury anonymity does not, by itself, automatically mean that the trial court necessarily violated Samonte's constitutional right to a presumption of innocence. *See United States v. Vario,* 943 F.2d 236, 241 (2nd Cir. 1991) ("Although the district court here did not instruct the jury in order to explain their anonymity, there is no reason to believe that the absence of instructions led the jurors to conclude other than that it is a common practice to keep jurors' names and identities in confidence") (citation, quotation marks and brackets omitted), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992).

Considering the totality of circumstances, we hold that the trial court took reasonable steps to minimize any prejudicial effects that the partially anonymous jury might have on Samonte and to protect Samonte's fundamental rights.

### 3. *Conclusion*

 We hold that the trial court did not abuse its discretion by concluding that there was strong reason to believe that the jury, Samonte, and the prosecution needed the protection of an anonymous jury, and (b) we hold that the trial court took reasonable precautions to minimize any prejudicial effects on Samonte and to ensure that his fundamental rights were protected. As a result, the trial court did not lose, destroy or sacrifice Samonte's constitutional right to a presumption of innocence and an impartial jury by ordering that the first names, the social security numbers, the street addresses and the phone numbers of prospective jurors and their spouses, and the names and phone numbers of their employers had to be redacted from the jury lists and jury information cards. Thus, despite the fact that HRS § 612–18(c) provides that "[t]he names of prospective jurors to be summoned to sit as a jury, and the contents of juror qualification forms completed by those jurors, *shall* be made available to the litigants concerned" (emphasis added), the trial court's mere "directory" construction of the word "shall" was correct under these unusual circumstances. *Cf. Perry,* 62 Haw. at 677, 619 P.2d at 103

(1980) ("the word 'shall' may be held to be merely directory when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to the individual, by giving it that construction") (citation and quotation marks omitted). The trial court did not abuse its discretion, and, accordingly, we affirm the trial court's order granting the prosecution's motion for jury anonymity.

### C. *Jury Taint*
#### 1. *Jury Taint With Respect to Outside Letters*

 Samonte contends that the trial court erred by allowing two jurors to remain on the jury and/or by failing to declare a mistrial after jurors received letters stating that this was Samonte's third trial, that Samonte had spent five years in jail, that Samonte was a menace to society, and that the jurors should find Samonte guilty. We disagree.

"A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment of the United States Constitution and article I, § 14 of the Hawaii Constitution. Inherent in this requirement is that the jury be free from outside influences." *State v. Okumura,* 78 Hawai'i 383, 393, 894 P.2d 80, 90 (1995) (quotation marks omitted) (quoting *State v. Williamson,* 72 Haw. 97, 102, 807 P.2d 593, 596 (1991); *State v. Keliiholokai,* 58 Haw. 356, 357, 569 P.2d 891, 893 (1977)).

Once there is a claim that an accused is being denied his or her right to a fair trial because of outside influences infecting a jury, the initial step for the court to take is to determine whether the nature of the outside influences rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. And whether it does rise to the level of substantial prejudice is ordinarily a question committed to the trial court's discretion. Where the trial court does determine that such influence is of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice is raised. The trial judge

is then duty bound to further investigate the totality of circumstances surrounding the outside influence to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the outside influence on the jury must be proven harmless beyond a reasonable doubt. The trial court, in its investigation of the totality of circumstances, should include individual examination of potentially tainted jurors, outside the presence of the other jurors, to determine the influence, if any, of the extraneous matters.

*Williamson*, 72 Haw. at 102, 807 P.2d at 596 (citations and quotation marks omitted).

While the jurors in the instant case were deliberating, two of the jurors received letters through the mail at their home addresses regarding Samonte. One of the letters to one of the jurors stated the following:

[Juror's name],

The defendant is as good as guilty. He has been in prison for five years. This is his third trial. You must find him guilty as charged. He is dangerous to society.

The second letter to a different juror stated the following:

[Juror's name],

Find the defendant guilty as charged. He has been in prison for five years. This is his third trial. He has no place in society. Let's send a message to others that they can't go around attempting to kill people. Find him guilty. Guilty, guilty, guilty.

In response, the trial court individually examined the two jurors who had received the letters, one juror at a time and outside the presence of all other jurors, to determine the influence, if any, of the letters. The trial court's examination of the first juror proceeded as follows:

THE COURT: [Juror], you may be seated, . . . . From time to time during trials there are reasons why a Court—a Court wants to talk to individual jurors about particular matters that occur.

And there is a particular matter that occurs in this case that I want to ask you about, and that is a communication that you have given to the Court that you received which has a postmark of February 2, 1994, which I believe was last Wednesday.

THE JUROR: Mm-hmm.

THE COURT: Is that correct?

THE JUROR: Well, I—I think that's the postmark date. I don't remember exactly what day that is, whether it was Wednesday or what.

THE COURT: When did you receive this letter?

THE JUROR: I received that Thursday evening when I went home from here, and then I turned it in Friday morning here. I gave it to [the bailiff] Friday morning. I think that's correct.

BAILIFF: (Nodded head up and down.)

THE COURT: So you were at home when you received it?

THE JUROR: Yes, it was in the mail. There was a stack of mail on the counter that my daughter had brought in like she usually does and put it in front of the microwave on the kitchen counter. And I went through the mail and it was one of the letters in that stack.

THE COURT: I take it you opened it and read it?

THE JUROR: I opened it, read it briefly, and then didn't read anything more after that.

THE COURT: Have you talked to anybody about it?

THE JUROR: No, other than—I told my family about it because I thought that might indicate there might be some other interference or something, and I would have felt very bad if I had not told them. I said it was not a threat but I said that I want you to know that somebody might come around or something and you let me know if anything like that happens.

THE COURT: All right. Let me see counsel at the bench, please, off the record, for a moment.

(Discussion had off the record.)

THE COURT: Now, [Juror], tell me as best you can recall the conversation that you had with your family, that is, what

they related to you and what you related to them.

THE JUROR: All I related to them was that I had received this letter about the trial that I was, you know, a juror for. And I said, you know, if anybody—it might indicate that we might receive some more things in the mail. I said don't open them up, don't touch them, don't do anything with them.

Frankly, I though it might even be things like a mail bomb or something. That's extreme, but I didn't want them involved in any way and I felt I had to warn them. I felt I would have felt really remiss if I had not warned them about something and something violent did happen. So I just—I just wanted to warn them.

They took it very lightly. They said, well, was it a threat? My daughter asked me was it a threat? I said I can't tell you what's in the letter, all I can say is it's not a threat.

THE COURT: My question to you now is: Can you continue to deliberate in this case basing your decision and your thinking only on the evidence that has been presented during the trial and the question of law—that is, and the instructions of law which the Court has given you and not be influenced by anything that you have heard outside of this courtroom or read outside of this courtroom?

THE JUROR: I think I can. Yes, I can.

THE COURT: Thank you, [Juror]. Let me see counsel at the bench again, please. Off the record initially.

(Discussion had off the record.)

THE COURT: All right. [Juror], I want to direct you not to speak to anybody about this proceeding and the questions I have put to you and the answers you have put to the Court, or about anything that we have talked about, with anybody including your fellow jurors. You understand?

THE JUROR: That's going to be the hard part. Yes, I understand. I'll do that.

THE COURT: All right. Thank you [Juror]. You're excused.

(The juror exited the courtroom.)

The trial court's examination of the second juror proceeded as follows:

THE COURT: Good morning, [Juror].

THE JUROR: Yes, good morning.

THE COURT: Thank you. Have a seat and relax.

From time to time during trials, [Juror], a Court has reason to talk to and ask questions to individual jurors, and that's what I'm doing now with you. And just bear with it for a short time.

The Court understands that you received a written communication during trial and you turned it over to the law clerk who, in turn, has turned it over to the Court. And you did receive that communication, didn't you?

THE JUROR: Yes, sir.

THE COURT: And will you tell us when you received it?

THE JUROR: Thursday morning.

THE COURT: Okay. And just tell us the circumstances in which you became aware of it.

THE JUROR: I went home and saw the letter addressed to me and the return address was a person I didn't know. I—I just didn't know what it was so I opened it as a regular letter. And as soon as I saw in the sentence "the defendant," I closed it up and called the Court on the record-a-phone and then presented it to the clerk on Friday.

THE COURT: All right. Now, did you talk to anybody about the communication?

THE JUROR: No, sir.

THE COURT: Anybody whatsoever?

THE JUROR: I just told my mom something to do with the case, and that's it. No—none of the other jurors know about it.

THE COURT: Do you recall what your conversation was with your mother in that regard?

THE JUROR: That was it, just something about the case I'm not supposed to know so I closed it.

THE COURT: All right. Now, for the record since we're talking about the communication, this was the communication

that in substance urged you to find the defendant guilty?

THE JUROR: Something along those lines, yes, sir.

THE COURT: Now, the question I want to ask you is whether you can continue to deliberate in this case as a juror basing your decision just on the evidence that has been presented during trial and the instructions of law and not be influenced in your deliberations by the communication. Can you do that?

THE JUROR: I feel I can. I came this far, I have an oath to be fair and impartial to the State, to the defendant, and try look at as much of the evidence presented as possible. And since I've come this far from work, catching a cold from everybody, I would like to finish it up.

THE COURT: All right. Thank you very much, sir. I'm going to direct that you not to speak to anybody [sic] about this proceeding that you're sitting in right now and the questions I've put to you and the answers you've put to the Court. In other words, you do not speak to anybody at all, including your fellow jurors, about this proceeding. Do you understand?

THE JUROR: Yes, sir.

THE COURT: And certainly not about—that is, you do not speak to anybody about the communication that you received as well; do you understand?

THE JUROR: Yes, sir.

THE COURT: And, of course, you expressed to me that you understood that before and you hadn't spoken to anybody before about this proceeding, about the communication?

THE JUROR: Yes, sir.

THE COURT: All right, [Juror]. Do you have any questions?

THE JUROR: I'm just curious to know how the person knew who I was.

THE COURT: Well, that's something that will be dealt with at a later time. Now, before you leave, let me see counsel at the bench, off the record initially.

(Discussion had off the record.)

THE COURT: Just one question, [Juror], did you recognize the return address on the envelope?

THE JUROR: I don't remember the address. It's just from Aiea.

THE COURT: That's all that you recall?

THE JUROR: Yes, sir.

THE COURT: I want to thank you, [Juror]. You're excused at this time to join the rest of the jurors. Thank you.

(The juror exited the courtroom.)

After a recess, the trial court reconvened in the presence of the entire jury:

THE COURT: The record will reflect the presence of counsel and Mr. Samonte and the ladies and gentlemen of the jury.

Good morning to you, ladies and gentlemen.

THE JURY: Good morning, sir.

THE COURT: Now, ladies and gentlemen, during the course of trial from time to time a Court reconvenes with a jury that's in deliberation just to ask the juror or jurors questions and to remind the jurors as to certain instructions that the Court has given to the jurors during the course of trial. And that's what I'm doing now.

I have a question to ask each of you and it is this: Other than has already been discussed with the Court, has anyone here been approached or received any communication about this case which you have not informed the Court about? That's my question to you. Other than may have already been discussed with the Court.

All right. Let me remind you, ladies and gentlemen—well, let me first state for the record that none of you have indicated an answer to my question.

Let me remind you that you, of course, are not to speak to anyone about the case or permit anyone to speak to you about the case. You are to do as much as is humanly possible to not permit yourself to be exposed to any publicity about the case, and there may very well be publicity about the case. So far there's been little, but there may very well be publicity about the case so I want you to do everything you can to avoid it.

And I want you to report to the Court immediately, and I told you this before, if anybody approaches you or in any way attempts to communicate with you about this case.

Following a brief recess, the trial court reconvened without the jury to announce its finding with respect to the jury and the letters:

THE COURT: All right. The record will reflect the presence of both counsel and Mr. Samonte and the absence of the ladies and gentlemen of the jury, who are at this point back in the jury deliberation room deliberating.

The Court has found that the jurors can continue to fairly deliberate in this case based on the facts and circumstances in the record.

We note at the outset that neither of the letters threatened the two jurors, nor did the jurors perceive the letters as threats to their own well being. Nevertheless, because the two letters might have substantially prejudiced Samonte's right to a fair trial, the trial court cautiously investigated the totality of circumstances surrounding the letters by conducting individual examinations of the two potentially tainted jurors, one at a time, and outside the presence of the other jurors. Both jurors told the trial court that they had not discussed the letters with any of the other jurors, and both jurors told the trial court that they believed they could continue to deliberate and base their decisions on only the evidence that had been presented during trial. Both jurors also agreed that they would disregard the letters during their deliberations. We see no error in the trial court's finding that the jurors could continue to fairly and impartially deliberate in this case based on the facts and circumstances in the record, because, based on the totality of circumstances, it appears that the influence of the letters on the jury was harmless beyond a reasonable doubt.

■ Samonte further argues that the trial court erred by not conducting individual voir dire of the remaining ten jurors regarding the two letters. As stated, "the initial step for the court to take is to determine whether the nature of the outside influences

rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury." *Williamson*, 72 Haw. at 102, 807 P.2d at 596. The record shows that when the trial court asked the remaining jurors whether they had received outside communications, none of the remaining jurors responded in the affirmative. Under such circumstances, the trial court was under no duty to individually interrogate the remaining jurors. *Id.; see also State v. Mabuti*, 72 Haw. 106, 112, 807 P.2d 1264, 1268 (1991) (affirming a trial court's denial of a motion for mistrial based on jury impartiality when, "on being asked by the court whether statements were made to the jury, concerning anonymous phone calls, the jurors gave no affirmative responses").

Samonte moved for a mistrial numerous times based on the effect of the two letters on the jurors, which the trial court denied. "As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *State v. Furutani*, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994) (citations omitted). The same principle is applied on the context of a motion for new trial premised on an impartial jury. *See id.* at 179, 873 P.2d at 58 (regarding "a motion for a new trial premised on juror misconduct"). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citations and quotation marks omitted). Because we conclude that the trial court was correct in finding that the jurors could continue to fairly and impartially deliberate in this case based on the facts and circumstances in the record, we hold that the trial court did not abuse its discretion by denying Samonte's related motions for a mistrial.

2. *Jury Taint With Respect to a Reference about the General Area in Which a Juror Lived*

■ Samonte contends that the trial court erred in allowing two of the jurors to remain on the jury and/or failing to declare a

mistrial after the court became aware that one of these jurors expressed a belief to the other that references had been made by defense counsel during voir dire about the juror's general area of residence in an attempt to intimidate the juror. This information did not come to the court's attention until after the jury had reached a decision on three of the five counts. We find no error by the court.

At one point during jury deliberations, a juror asked a judicial clerk why defense counsel had been able to state the general area where the juror lived during pretrial voir dire. The juror had also mentioned this concern to a second juror. Upon learning about this communication, the trial court questioned these two jurors, one at a time, outside the presence of the rest of the jurors. The trial court's questioning of the first of these two jurors proceeded as follows:

THE COURT: Have a seat and make yourself comfortable. [Juror], during trials it is not uncommon for a Court to ask a juror to come in and sit down and—and ask some questions to the juror, so don't feel like something is being done now that is unusual. It's very common for the Court to do this in trials.

I have a question to ask you. [The Judicial Clerk], my assistant, who has custody of the jury during lunch hour reported to me that you had expressed some concern about the fact that you live in [the general area of the alleged crimes]—

THE JUROR: Yes.

THE COURT: Okay. Can you tell us what you said to [the Judicial Clerk]?

THE JUROR: I asked [the Judicial Clerk] if it—if it was allowed in court to say where we live because I thought in the beginning they were saying that we were not supposed to—nobody was supposed to mention where we live.

THE COURT: Well, what was your concern? That it was related that you lived in [the general area of the alleged crimes], was that the concern?

THE JUROR: Yes.

THE COURT: Anything else?

THE JUROR: Well, I just didn't want anybody—well, some of my friends have been telling me about some defendants, they look at the juror and, you know, they kind of memorize their names or where they live. And, I just don't want anybody to come looking after me after work.

THE COURT: All right. Now, [Juror], the real question that is in this case: Can you continue to be a fair and impartial juror in this case?

THE JUROR: I guess I can.

THE COURT: Okay. You feel you can?

THE JUROR: Mm-hmm.

THE COURT: Can you continue to base your deliberations with your fellow jurors just on the evidence that is produced during the trial and the instructions of law that the Court has given you?

THE JUROR: (Nodded head up and down.)

THE COURT: Can you do that?

THE JUROR: Yes, I can.

THE COURT: And can you continue once again to be a fair and impartial juror and to continue your deliberations?

THE JUROR: Yes, I hope. I will try it.

THE COURT: All right. Let me see counsel at the bench, please, off the record.

(Discussion had off the record.)

THE COURT: Now, before I let you go to return to the—to your fellow jurors, [Juror], did you relate to [the Judicial Clerk] that you were scared or you had some fear?

THE JUROR: Well, I had—I was just questioning because in the beginning my impression was they were not supposed to say where we live. And then—to tell you the truth, I took it as intimidation.

THE COURT: Say that again.

THE JUROR: I took it as intimidation.

THE COURT: I see. Well, both the State and the Defense, you understand, have the same information in this case. In other words, it's not just one side. You understand that?

THE JUROR: Mm-hmm.

THE COURT: [Juror], when you say you took it as intimidation, will you explain that to the Court? What do you mean?

THE JUROR: I don't know if he purposely said it out loud or, I don't know, I could have been mistaken because, like I said, my impression was that they were not supposed to say where we live.

THE COURT: All right. Now, did this concern that you had—well, would this concern that you have in any way interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: I always thought it wouldn't, no.

THE COURT: So I take it then you feel you can continue to be a fair and impartial juror?

THE JUROR: Yeah, but it's up to you if you want to release me. I would be willing to go, too.

THE COURT: I'm concerned about your feelings and what you feel you can do. You can—do I understand you now that you feel you can be fair and impartial, that is, continue to be fair and impartial?

THE JUROR: I can be fair. I mean, I always look at things openly.

THE COURT: All right. . . .

Following proceedings at the bench, the trial court continued:

THE COURT: [Juror], just another question or two. First, I do want you to know that the Court made the city or the district where each juror resides available to each side so they could question the jurors about where they lived and whether or not they lived in the vicinity of where the—the incident that is being tried here today was alleged to have taken place because the Court wanted the counsel to be able to question the jurors about whether or not they had some personal knowledge of the incident or the fact that they lived in the general area might interfere or affect their deliberations.

You understand that I permitted counsel to have that information and to question jurors about that? Do you understand what I'm saying to you?

THE JUROR: Oh, well, I didn't know—

THE COURT: I'm not asking you to agree that I did the right thing, but I want you to know that the Court did that. Do you understand?

THE JUROR: Yeah, I do.

THE COURT: [Juror], would your concern or feeling that maybe defense counsel uses information to intimidate you—

THE JUROR: Well, that's how I felt at that time.

THE COURT: Okay. You mean when you were—when he was questioning you?

THE JUROR: Yes, 'cause of—well, like I told you at the time, I didn't know what they were supposed to be, you know, saying that in front of everybody.

THE COURT: Okay. Would your feeling that he did that for that purpose, to intimidate you, would that interfere now with your ability to be a fair and impartial juror or could you continue to be a fair and impartial juror?

THE JUROR: I could I still be fair [sic]. But if you believe that I wouldn't be fair, like I told you, I'm willing to go.

THE COURT: Well, I'm asking you—I appreciate what your saying that to me [sic], but I'm asking about what your feelings and beliefs are and I'm not suggesting to you what mine are. Okay? I just want you to honestly tell me what yours are.

THE JUROR: I can still be fair.

THE COURT: All right. Thank you. I'm going to excuse you at this time, [Juror]. I want to thank you very much. Please do not speak to your fellow jurors now about our discussion here or even about the fact that I've asked you to be here and I've asked you questions. Okay? Do you understand?

THE JUROR: Yes.

THE COURT: Thank you very much. You may return to your fellow jurors.

Court will remain in session.

(The juror exited the courtroom.)

After finding that the first juror could be fair and impartial, the trial court called in the second juror and proceeded to question the second juror about what the second juror had discussed with the first juror as follows:

THE COURT: Make yourself comfortable. And understand that it's not uncommon for the Court to ask questions to jurors during jury deliberation, that is, call individual jurors in and ask questions. So don't feel like something is being done that's unusual, it's not. Okay?

THE JUROR: Okay.

THE COURT: But there was a comment that was made by you to [the Judicial Clerk], my—my clerk. I believe it was made last week during a luncheon recess, that is, when you were being taken to lunch. And it concerned, based on what I'm informed, the feelings of [the first juror]. Do you recall making the statement to [the Judicial Clerk] concerning [the first juror] and how [the first juror] felt?

THE JUROR: No.

THE COURT: You don't?

THE JUROR: (Shook head from side to side.)

THE COURT: Do you recall any statement with respect to the attorneys knowing where—the part of the island that the jurors lived?

THE JUROR: Oh, oh, oh, oh, okay, okay. We were wondering when we were—before we were finally selected as jurors, the counsels had a copy of our questionnaire. And we noticed there were some black lines and we were wondering what was blacked out.

However, when [the first juror] was questioned, the one that was picked, one of the counsels said oh, I notice you live in this area of town. Now, if we weren't to reveal our first names or where we worked, how did he know what area of town [the juror] lived in? And this particular [juror] coincidentally had the same last name and lived in the same area of town.

So we were just wondering what was blacked out on the questionnaire.

THE COURT: All right. Now, is there anything about that concern that you had that would interfere with your ability to be a fair and impartial juror—

THE JUROR: No.

THE COURT: —in this case?

THE JUROR: No.

THE COURT: All right. . . .

After holding proceedings with counsel at the bench, the trial court continued:

THE COURT: Now, [Juror], the Court did at the very beginning of trial provide counsel with the areas of the island that the various jurors lived in to permit counsel to ask jurors questions to make sure that the jurors did not live so close to where the alleged incident took place that it might influence the jurors or interfere with their ability to be fair and impartial.

So it was the Court's intent that the counsel have knowledge of the general area where the juror lived and that counsel be able to, if counsel chose, to ask questions to the juror—

THE JUROR: Yes.

THE COURT: —about that general area where the juror lived, and, again, whether or not they lived so close to where the alleged incident took place it might influence already their decision making.

THE JUROR: Yes.

THE COURT: All right, thank you. I want to thank you, [Juror], and I want to direct that you not speak to your fellow jurors about not only what I have asked you about and what you have related to the Court in this proceeding here, but also about the very fact that we had this proceeding and that we talked to you individually.

THE JUROR: Yes. There's one question.

THE COURT: Sure.

THE JUROR: I realize that information was provided to counsel from what you just said, but what we were concerned about was because from the very beginning you said that our identities were going to be protected. So we were just wondering how protected was it if they had our last names and had the area where we lived, whereas if you had only the first names and had the area where we lived, it would be harder to trace.

THE COURT: Your point is a fair one.

THE JUROR: That was our concern.

THE COURT: Let's put it like this. There's no absolute guarantee that a person that—that a, you know, the identity of the person cannot be determined. All we try to do is make it a little less readily accessible to somebody. We do not have— you know, as we go about our trials, we try many cases and we do not have problems as a general rule.

THE JUROR: Mm-hmm.

THE COURT: So I don't want you to get worried or have anxieties that would in any way interfere with your deliberations in this case as a juror.

THE JUROR: Yes.

THE COURT: But your point is a good one and I'll keep it in mind. Okay. Thank you very much. You're excused to join your fellow jurors.

(The juror exited the court room.)

The trial court then specifically found that both the first and the second juror could be fair and impartial jurors.

Similar to the earlier incident involving the issue of whether jurors were tainted, the trial court cautiously investigated the totality of circumstances surrounding the question of whether the jurors were tainted by the fact that defense counsel had openly noted the area in which one juror lived. The trial court conducted individual examinations of the two potentially tainted jurors, one at a time, and outside the presence of the other jurors. Both jurors told the trial court that they could continue to be fair and impartial jurors. Both jurors also agreed that they would not mention this individual questioning to other jurors during the remainder of their deliberations. We agree with the trial court's finding that the jurors could continue to fairly and impartially deliberate in this case, because, based on the totality of circumstances, it appears that the influence of defense counsel mentioning the general area in which a juror lived was harmless beyond a reasonable doubt.

■ Samonte further argues the trial court erred by not conducting individual voir dire of the remaining ten jurors regarding this particular matter. As stated, "the initial step for the court to take is to determine whether the nature of the outside influences rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury." *Williamson*, 72 Haw. at 102, 807 P.2d at 596. The record shows that none of the remaining jurors expressed the same concern about defense counsel knowing the general areas of their residences, and the trial court specifically requested that the two jurors who had expressed such concern should refrain from discussing this concern with any of the remaining jurors. Under such circumstances, the trial court was under no duty to individually interrogate the remaining jurors about this particular matter.

Samonte moved for a mistrial numerous times based on the two jurors' concerns about the use of a juror's last name and the juror's general area of residence, which the trial court denied. Because we conclude that the trial court was correct in finding that the jurors could continue to fairly and impartially deliberate in this case, we hold that the trial court did not abuse its discretion by denying Samonte's related motions for a mistrial. *Furutani*, 76 Hawai'i at 178–79, 873 P.2d at 57–58.

3. *Jury Taint With Respect to an Alleged Telephone Conversation with a Juror*

■ Samonte contends that the trial court erred by failing to voir dire a juror as to whether the juror had received a phone call regarding Samonte's case after the court was informed by Samonte that he had been told by a prospective juror that the juror had received such a call, thus raising the issues of jury tampering and nondisclosure by a juror. As a result of this alleged communication, Samonte moved for a mistrial.

During jury deliberations, Samonte informed the trial court that a prospective juror had contacted Samonte by letter and by telephone after she had not been selected as a member of the jury, and that the prospective juror had told Samonte that she knew someone else, a third party, who had contacted a juror and had discussed this case together with the juror. Samonte did not know who the third party was, nor did he

express what the third party had allegedly discussed with the juror. When counsel for Samonte requested an individual examination of the juror, the trial court noted that it had already asked all members of the jury earlier that same day about whether anyone had contacted them since the beginning of the trial, and the jurors had indicated through responses to the trial court's questions that no one had attempted to contact them. Under such circumstances, the trial court was under no duty to individually interrogate the juror or the remaining jurors. *Williamson,* 72 Haw. at 102, 807 P.2d at 596; *see also Mabuti,* 72 Haw. at 112, 807 P.2d at 1268 (affirming a trial court's denial of a motion for mistrial based on jury impartiality when, "on being asked by the court whether statements were made to the jury, concerning anonymous phone calls, the jurors gave no affirmative responses"). Thus, we conclude that the trial court was correct in finding that the jurors could continue to fairly and impartially deliberate in this case, and we further hold that the trial court did not abuse its discretion by denying Samonte's related motion for a mistrial. *Furutani,* 76 Hawai'i at 178–79, 873 P.2d at 57–58.

### D. *Expert Testimony of Judith Christensen*

■ Samonte contends that the trial court erred by overruling his objections related to the trial court's finding that Judith Christensen was qualified to testify as an expert in the test-firing of weapons, in the test-firing of ammunition and their operability, and in the comparison of casings to determine whether they had been fired from a particular weapon. We disagree.

During the trial, the prosecution attempted to prove that Samonte, as a convicted felon, possessed a firearm and ammunition (while firing a rifle at Mrs. Ancheta, Glenn Ancheta and Officer Cauton) in violation of HRS § 134–7(b). HPD Evidence Specialist Errol Kilangtang testified that, on December 27, 1988, he reported to 94–838 Kumukula Street where he took pictures and recovered lead fragments, cartridges, spent casings, and wood splinters. Kilangtang also recovered a loaded .22 caliber rifle that was leaning

against a chair on the second floor. Mrs. Ancheta testified that on December 27, 1988, a police detective had shown her the rifle that police had recovered after the incident, and Mrs. Ancheta stated that she was able to identify the rifle as the weapon that Samonte had used during his attack.

In order to further establish that Samonte had used the rifle and ammunition during the attack, the prosecution presented an expert witness, HPD Criminologist Judith Christensen (Christensen), to testify whether spent casings from the scene of the crime had been fired from that particular rifle. Christensen testified that she test-fired two cartridges from the rifle that police had recovered from the house. The first cartridge fired properly, but the second cartridge jammed. Upon examining the striation patterns on the casings, Christensen concluded that the casing she had fired matched six casings that police had recovered from the house. Christensen also used a .22 rifle and test-fired one of five cartridges that police had found at the scene of the crime, and she concluded that the cartridge constituted live ammunition.

Nevertheless, Samonte contends that the trial court erred by finding that Judith Christensen was qualified to testify as an expert witness on this subject matter. "Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." *State v. Maelega,* 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995) (quoting *State v. Montalbo,* 73 Haw. 130, 140–41, 828 P.2d 1274, 1281 (1992)) (quotation marks and citations omitted). The Hawai'i Rules of Evidence (HRE) governing the admissibility of expert scientific testimony are as follows:

> **Rule 702 Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scienti-

fic technique or mode of analysis employed by the proffered expert.

HRE Rule 702 (1993).

**Rule 703 Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

HRE Rule 703 (1993). Based upon these two rules, we utilize a two-pronged analysis with respect to the admissibility of proposed expert testimony:

> The critical inquiry with respect to expert testimony is whether such testimony will assist the trier of fact to understand the evidence or determine a fact in issue. HRE Rule 702. Generally, in order to so assist the jury an expert must base his or her testimony upon a sound factual foundation; any inferences or opinions must be the product of an explicable and reliable system of analysis; and such opinions must add to the common understanding of the jury. *See* HRE Rule 703.

*Maelega,* 80 Hawai'i at 181, 907 P.2d at 767 (citation, quotation marks, brackets and ellipses omitted); *Montalbo,* 73 Haw. at 138, 828 P.2d at 1280. "In other words, expert testimony must be both [ (1) ] relevant and [ (2) ] reliable." *Maelega,* 80 Hawai'i at 181, 907 P.2d at 767. In determining whether a litigant has satisfied these two prongs with respect to proffered scientific evidence, we utilize five factors:

(1) the evidence will assist the trier of fact to understand the evidence or to determine a fact in issue;

(2) the evidence will add to the common understanding of the jury;

(3) the underlying theory is generally accepted as valid;

(4) the procedures used are generally accepted as valid;

(5) the procedures were applied and conducted properly in the present instance.

*Maelega,* 80 Hawai'i at 181, 907 P.2d at 767; *Montalbo,* 73 Haw. at 140, 828 P.2d at 1280–81.

With respect to the relevancy prong, in the instant case the prosecution was seeking to prove that the fired casings recovered by the police at the scene of the offense had been fired from the rifle that Samonte had fired at Mrs. Ancheta and Glenn Ancheta, and, thus, that Samonte had possessed the rifle and ammunition in violation of HRS § 134–7(b). Accordingly, we hold that Christensen's testimony was relevant, specialized knowledge that would assist the jury in determining whether Samonte had possessed a firearm and ammunition on December 27, 1988.

"We now turn to the reliability prong of the analysis[,]" in which we must determine whether the scientific evidence is generally accepted in the relevant scientific community. *Maelega,* 80 Hawai'i at 182, 907 P.2d at 767. During voir dire, the expert, Christensen, testified that she had been employed at the HPD as a criminologist for nine years, and as an evidence specialist for four years. As a criminologist, Christensen examined evidence and performed, among other analyses, test-firings of firearms and ammunition. Christensen received training in test-firing in the HPD laboratory and at the HPD firing range. While working as a criminologist, Christensen received instruction on test-firing from Gilbert Chang, the HPD crime laboratory director. Over the span of several years, Christensen test-fired weapons hundreds of different times, and she test-fired ammunition between 110 and 120 times. Christensen performed comparisons of casings to determine whether they had been fired from particular weapons "maybe about 12 to 15 times." However, Christensen had analyzed metal fragments to determine whether they were consistent with lead only once. Courts had determined that Christensen had qualified as an expert witness in the test-firing of weapons and ammunition "about a dozen times." On one of those

534

occasions, Christensen had been qualified as an expert witness to testify in court about the comparison of casings and weapons to determine whether the casings had been fired from a particular weapon. Christensen admitted that she had not attended any seminars outside of the HPD dealing with the comparison of casings, and that she had never read a treatise on the comparison of .22 caliber rifle casings. However, Christensen had read criminology books containing articles on the comparison of casings.

Accordingly, over Samonte's objection, the trial court qualified Christensen as "an expert with respect to the test firing and operability of weapons, and with respect to the test firing and determination of whether ammunition is live ammunition, and with respect to the examination and comparison of casings and firearms to determine whether a casing was fired by a particular person." We agree with the trial court that Christensen provided relevant specialized knowledge, unknown to the average juror, which would assist the jury in determining whether the six casings at the scenes of the crime had been fired from the rifle that Samonte had fired. We discern nothing from the record to indicate that the trial court abused its discretion in making this determination. Thus, we hold the trial court did not abuse its discretion in finding that Christensen was qualified to testify as an expert witness, and in admitting Christensen's expert testimony into evidence.

E. *The Admissibility of the Redacted Judgment of Samonte's Previous Conviction Based upon a Nolo Contendere Plea*

Samonte contends that the trial court erred by admitting into evidence a redacted copy of a judgment in Criminal No. 6064, indicating that "IT IS ADJUDGED that [Samonte] has been convicted of and is guilty of the offense of ... BURGLARY IN THE FIRST DEGREE[,]" because this previous conviction was based on Samonte's plea of nolo contendere.[8] The prosecution introduced the redacted judgment of conviction to prove that Samonte was already a convicted felon at the time when he possessed a firearm and ammunition, and, thus, violated HRS § 134–7(b).

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Kealoha v. County of Hawai'i,* 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993), *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). Under the circumstances in the instant case, the issue of whether the redacted judgment of Samonte's previous conviction was admissible as evidence can yield only one correct result, and, thus, we review the trial court's admission of the redacted judgment into evidence according to the right/wrong standard.

■■■ Samonte contends primarily that the redacted judgment of his conviction was not admissible into evidence because Hawai'i Rules of Evidence (HRE) Rule 803(b)(22) (1993) provides that the hearsay exception for past felony convictions does not apply to past felony convictions that were based upon a nolo contendere plea.

**Rule 803 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

against the defendant in a civil action based upon the same acts.... Such a plea shall be accepted by the court only after due consideration of the views of the parties and the interest of the public in the effective administration of justice." *Black's Law Dictionary* 1048 (6th ed.1990) (citations omitted).

8. Nolo contendere, or "no contest," is defined as a "[t]ype of plea which may be entered with leave of court to a criminal complaint or indictment by which the defendant does not admit or deny the charges, though a fine or sentence may be imposed pursuant to it. The principle difference between a plea of guilty and a plea of nolo contendere is that the latter may not be used

. . . .

(b) Other exceptions:

. . . .

(22) *Judgment of previous conviction.* Evidence of a final judgment, entered after a trial or upon a plea of guilty (*but not upon a plea of nolo contendere* ), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, *to prove any fact essential to sustain the judgment,* but not including, when offered by the government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused. The pendency of an appeal may be shown but does not affect admissibility.

(Emphases added). HRE Rule 803(b)(22) clearly controls the admission of a previous felony conviction when a party intends to introduce the previous conviction into evidence "to prove any fact essential to sustain the judgment," such as in a subsequent civil law suit arising out of the same factual scenario. *See State v. Merino,* 81 Hawai‘i 198, 211, 915 P.2d 672, 686 (1996) ("The principal difference between a plea of guilty and *a plea of nolo contendere* is that the latter *may not be used* against the defendant *in a [subsequent] civil action* based upon the same acts.") (emphases added) (citations and internal quotation marks omitted). However, Samonte's proposed application of HRE Rule 803(b)(22) to subsequent criminal prosecutions involving HRS § 134–7(b) would effectively nullify HRS § 134–7(b) with respect to all felons whose convictions were based on nolo contendere pleas.

"We shall not construe statutes so as to bring about an absurd result." *State v. Lee,* 67 Haw. 307, 314, 686 P.2d 816, 820 (1984). Although the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination.

Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute. *Sato v. Tawata,* 79 Hawai‘i 14, 17 897 P.2d 941, 944 (1995) (citation, internal ·quotation marks, brackets, and ellipsis points omitted).

The Hawai‘i legislature has indicated that HRS § 134–7 applies to *all* convicted felons. For example, noting that "[l]icensed or registered firearms owners very seldom commit crimes with their guns," the 1971 Hawai‘i legislature targeted severe punishment such as a "mandatory sentence of not less than one year" specifically at all *"persons convicted of any felony* . . . possessing any firearms or ammunition[.]" Senate Stand. Comm. Rep. No. 524, in 1971 Senate Journal at 1036 (emphasis added). Having "come to the conclusion that severe penalties and incarceration must be adopted as the only meaningful method of stopping gun crimes[,]" *id.,* the Hawai‘i legislature's purpose for HRS § 134–7(b) has clearly been to keep firearms and ammunition out of the hands of anyone who has "committed a felony[.]"

▮▮▮▮ A plea of nolo contendere to a felony charge, once accepted by the trial court, becomes a felony conviction. *Cf. State v. Smythe,* 72 Haw. 217, 220, 811 P.2d 1100, 1102 (1991) ("A plea of no contest, under our rules, requires the approval of the court, but once it is accepted by the court, it is for the purposes of HRS § 701–109(4), a 'conviction.' "). A person who is convicted of a felony through a nolo contendere plea is no less dangerous than another person who is convicted of the same felony through a guilty plea; both persons are convicted felons, and, thus, too dangerous, in the eyes of the Hawai‘i legislature, to possess firearms or ammunition. Accordingly, HRS § 134–7(b) applies to felons who were convicted through a nolo contendere plea. In order to achieve

the purpose of HRS § 134–7(b), a defendant's felony conviction based upon a nolo contendere plea must be admissible as evidence when the prosecution is trying to show that the defendant was already a convicted felon at the time he or she possessed a firearm or ammunition in violation of HRS § 134–7(b), despite that HRE Rule 803(b)(22) excludes evidence of a felony conviction based upon a nolo contendere plea under other circumstances.

Furthermore, HRE Rule 803(b)(22) is not applicable to a prosecution of HRS § 134–7(b) because, under such circumstances, proof of the previous conviction is at issue rather than proof of the facts sustaining the previous conviction. Federal Rule of Evidence (FRE) Rule 803(22) is identical to HRE Rule 803(b)(22), and the United States Court of Appeals for the Fifth Circuit *implicitly* indicated that the prohibition against admitting nolo contendere convictions under FRE 803(22) is not applicable when the judgment of previous conviction is *not* offered to prove a fact essential to sustain the previous conviction. *United States v. Williams*, 642 F.2d 136 (5th Cir.1981). More specifically, the *Williams* court concluded that "[a]dmitting a nolo [contendere] conviction under [FRE] Rule 609 [for the purpose of impeaching a defendant] is well founded." *Id.* at 138. Although the *Williams* court did not specifically address the prohibition against admitting nolo contendere convictions under FRE Rule 803(22), the defendant argued "that a conviction which is otherwise admissible under [FRE Rule] 609 should not be admitted if based on a plea of nolo contendere[,]" *id.*, because, among other reasons, "a Georgia law prohibit[ed] the use of a nolo plea for any purpose in a subsequent proceeding." *Id.* at 140 n. 5. Despite the existence of FRE Rule 803(22), the *Williams* court held that the defendant's "prior state bribery conviction based on a plea of nolo contendere was properly admitted" into evidence under FRE Rule 609 for the purpose of impeaching him. *Id.* at 140. "As a nolo plea is an admission of every element of the offense, a conviction based on such a plea is as conclusive for the purposes of [FRE Rule] 609 as a conviction based on a guilty plea or verdict." *Id.* (citation and footnote omitted).

Under other circumstances, the United States Court of Appeals for the Sixth Circuit held that Federal Rule of Evidence (FRE) Rule 803(22) "is not applicable where the judgment of previous conviction of a person .... is not offered to prove a fact essential to sustain the judgment." *United States v. Breitkreutz*, 977 F.2d 214, 221, (6th Cir.1992). In *Breitkreutz*, the government introduced into evidence a copy of the previous conviction of a defendant's alleged coconspirator pursuant to the public records exception to the hearsay rule under FRE Rule 803(8). *Id.* In addition to prohibiting the admission of nolo contendere convictions, FRE Rule 803(22) also expressly prohibits the admission of "judgments against persons other than the accused." Despite the defendant's contention that his alleged coconspirator's previous conviction was inadmissible under FRE Rule 803(22), the *Breitkreutz* court held "that [FRE] Rule 803(22) is not applicable where the judgment of previous conviction of a person other than the accused is not offered to prove a fact essential to sustain the judgment[,]" but rather to prove the fact of the previous conviction. *Breitkreutz*, 977 F.2d at 221.

Arizona Rules of Evidence (ARE) Rule 803(22) is also identical to HRE Rule 803(b)(22), and in a case much closer on point with the instant case, an appellate court in Arizona held that the prohibition in ARE 803(22) against admitting nolo contendere convictions into evidence was *not* applicable in the prosecution of a defendant for offenses pursuant to statutes under which a prior felony conviction was relevant:

> Appellant ... argues that the prior felony conviction should not have been found true because it was proven by inadmissible hearsay evidence. He contends that the certified copy of the May 21, 1976, minute order which was used to prove the prior conviction was inadmissible hearsay because the conviction was entered after a *no contest plea*, and thus, did not fall within Rules of Evidence, Rule 803(22). *We reject appellant's argument*.

Rule 803(22) expressly provides a hearsay exception for the use of former judg-

ments "to prove any fact essential to sustain the judgment." *The State did not offer the former judgment to prove facts supporting the judgment. Rather, the certified copy of the minute entry was offered to prove the fact of the prior conviction. Thus, Rule 803(22) is not applicable.*

State v. Stone, 122 Ariz. 304, 594 P.2d 558, 564 (App.1979) (emphases added).

 Just as in *Stone,* the prosecution in the instant case did not move to admit the judgment of Samonte's previous conviction for burglary in the first degree in order to prove the facts that supported and sustained Samonte's previous conviction. Rather, the prosecution moved to admit the judgment into evidence to show the fact that Samonte was a convicted felon, and, thus, to prove an essential element of felon in possession of a firearm and felon in possession of ammunition in violation of HRS § 134-7(b). Therefore, similar to the situation in *Stone,* the prohibition against admitting nolo contendere convictions in HRE Rule 803(b)(22) is not applicable when the prosecution offers a previous nolo contendere conviction into evidence to prove the fact of the previous conviction rather than to prove the facts supporting and sustaining the previous conviction.

After holding that the prohibition against admitting nolo contendere convictions in ARE 803(22) was not applicable, the *Stone* court also went on to hold that the previous nolo contendere conviction was admissible as evidence pursuant to the Arizona public records exception to the hearsay rule under ARE Rule 803(8), which is substantially similar to the Hawai'i public records exception to the hearsay rule under HRE Rule 803(b)(8).

A minute entry [of *a previous judgment of conviction] is properly admissible to prove a prior conviction under Rules of Evidence, Rule 803(8), the public records exception to the hearsay rule.* That rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (8) Public records and reports. Unless the sources of information or other cir-

cumstances indicate lack of trustworthiness, records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . .

> (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel. . . .

A minute order of judgment or order of the superior court is a matter observed and recorded pursuant to duty imposed by law. A.R.S. § 11-553 provides that the clerk of the superior court shall "keep books of record required by law or rule of court." 17 A.R.S., Rules of Criminal Procedure, Rule 26.16, provides that, upon pronouncement of judgment and sentence, the clerk of the superior court "shall forthwith enter the exact terms of the judgment and sentence in the court's minutes." Verity is imported to a clerk's minutes. *State v. Biscoe,* 112 Ariz. 98, 537 P.2d 968 (1975).

[Therefore,] . . . *the certified copy of the May 21 minute entry [of the previous judgment of conviction] was properly admissible* [.]

Stone, 594 P.2d at 564 (emphases added).

 Similarly, the redacted judgment from Samonte's previous nolo contendere conviction for burglary in the first degree was admissible as evidence under the Hawai'i public records exception to the hearsay rule:

> **Rule 803 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (b) Other exceptions:
>
> . . . .
>
> (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ex-

cluding, however, in criminal cases matters observed by police officers and other law enforcement personnel or (C) in civil proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

HRE Rule 803(b)(8) (1993). Rules 22 [9] and 23 [10] of the Hawai'i Rules of the Circuit Courts impose a duty to issue a judgment, which, in turn, is stored as a public record. HRS § 602–5.5 (1993) provides the following:

§ 602–5.5 **Disposition of judiciary records**.... *A record of dispositional activity shall be maintained* stating whether a record was retained by the judiciary, transferred to public archives, the University of Hawaii, the Hawaiian Historical Society, or other agency, or destroyed. This record shall be kept on forms specified by the supreme court. The original copy of the record shall be filed in the public archives. *One copy of the record shall be filed with the court in which the records*

*originated,* one copy with the office of the attorney general, and one copy with the comptroller.

(Emphases added). Furthermore, Hawai'i Rule of Penal Procedure, Rule 32(c), requires the following:

A judgment of conviction in the circuit court shall set forth the plea, the verdict or findings, and the adjudication and sentence.... *The judgment shall be signed by the judge and entered by the clerk.* The *filing of the judgment* in the office of the clerk *constitutes the entry of the judgment.*

(Emphases added). Therefore, just as in *Stone,* a judgment of conviction in Hawai'i qualifies as a record of a public office or agency setting forth matters observed pursuant to a duty imposed by law as to which matters there was a duty to report. *See* HRE Rule 803(b)(8)(B). Accordingly, the redacted judgment of Samonte's nolo contendere conviction was admissible pursuant to the Hawai'i public records exception to the hearsay rule under HRE Rule 803(b)(8)(B).[11]

---

**9.** Rule 22 of the Hawai'i Rules of the Circuit Courts provides:

Whenever the court proposes to file a written decision on any motion or issue of law, it may at any time request one or more of the parties to submit a draft of decision. In such event, the court shall advise all parties of its action, and the draft so submitted shall be served, and an opportunity shall be given to opposing counsel to present comments with respect thereto. The failure of any party to submit comments with respect to any such draft shall not affect the right of such party to appeal from any judgment incorporated in or based on the decision as issued.

**10.** Rule 23 of the Hawai'i Rules of the Circuit Courts provides:

Within 10 days after decision of the court awarding any judgment, decree or order which requires settlement and approval by a judge, including any interlocutory order, the prevailing party, unless otherwise ordered by the court, shall prepare a judgment, decree or order in accordance with the decision and secure the approval as to form if opposing counsel thereon and deliver the original and one copy to the court, or, if not so approved, serve a copy thereof upon each party who has appeared in the action and deliver to the court the original and one copy along with notice of service on all parties. If any party objects to the form of a proposed judgment, decree or

order, that party shall within 5 days thereafter serve upon the prevailing party and deliver to the court a statement of that party's objections and the reasons therefor, or the form of the party's proposed judgment, decree or order, and in such event, the court shall proceed to settle the judgment, decree or order. Approval as to form shall not affect the right of any party to appeal from any judgment, decree or order issued.

**11.** The United States Court of Appeals for the Ninth Circuit held "that misdemeanor convictions can be admitted under the public records exception to the prohibition against hearsay." *United States v. Loera,* 923 F.2d 725, 730 (9th Cir.1991) (citing *United States v. Wilson,* 690 F.2d 1267, 1275 n. 2 (9th Cir.1982), *cert. denied,* 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983)), *cert. denied,* 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). Likewise, in a case involving a defendant charged with violation of the Armed Career Criminal Act, the United States Court of Appeals for the Fifth Circuit reached a similar result with respect to the admissibility of the defendant's three prior felony convictions. *United States v. Vidaure,* 861 F.2d 1337, 1341 (5th Cir.1988) (holding that certified copies of the defendant's three prior felony convictions "could be admitted under [FRE Rule] 803(8)"), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1551, 103 L.Ed.2d 854 (1989).

■ Samonte further contends that redacted judgment of conviction was not admissible as evidence because it was not "the judgment of conviction itself or a properly authenticated copy thereof[.]" Samonte's Supplemental Brief at 5.

A long established rule of evidence is that a judgment or decree itself is the highest and best evidence of its content. Consequently, the best evidence to prove a conviction is the judgment of conviction itself or a properly authenticated copy thereof. HRE 1002, 1003, and 1005; . . . .

Additionally, authenticated copies must comply with the applicable rules and statutes regarding attestation and certification. See HRE, Rule 902; Hawaii Rules of Penal Procedure, Rule 27 (1977); Hawaii Rules of Civil Procedure, Rule 44 (1972, as amended). Where the party seeking to prove a prior conviction has failed to show the unavailability of the judgment or a certified copy thereof, other evidence of conviction would not be competent to prove such prior conviction beyond a reasonable doubt.

*State v. Buffalo,* 4 Haw.App. 646, 649, 674 P.2d 1014, 1017 (1983) (some citations omitted) (holding that the prosecution failed to prove a defendant's prior felony conviction in California by submitting an "abstract of judgment" from California, which "[wa]s merely a device by which the execution of the order of probation or judgment of imprisonment [wa]s carried out."), *cert. denied,* 67 Haw. 686, 744 P.2d 781 (1984). Thus, Samonte claims that the prosecution, by merely introducing a redacted copy of Samonte's judgment of conviction, failed to satisfy the "best evidence" rule under HRE Rule 1002 (1993).[12]

However, the instant case is distinguishable from *Buffalo.* In addition to submitting the redacted copy of Samonte's judgment of conviction into evidence, the prosecution in the instant case also submitted to the trial court for identification a certified copy of the full judgment of conviction for a total of twenty separate counts in Criminal No. 6064. Because proof of only one previous felony

conviction was necessary under HRS § 134–7(b), the possibility existed that the twenty convictions in the certified copy of the judgment might prejudice the jury. Thus, after the prosecution submitted for identification the certified copy of Samonte's full judgment of conviction for twenty separate counts, including burglary in the first degree, the trial court agreed to accept into evidence the redacted copy of the judgment of conviction in which only one conviction, the conviction for burglary in the first degree, would appear.

In a similar case involving a defendant charged with, among other things, felon in possession of a firearm and ammunition, the Hawai'i Intermediate Court of Appeals (ICA) concluded that the prosecution sufficiently authenticated an uncertified, redacted copy of a judgment of conviction by also submitting and later withdrawing a certified copy of the full judgment of conviction (although the ICA eventually held that the redacted copy of the judgment was not admissible for other foundational reasons).

Finally, we consider Defendant's contention that the trial court erred in admitting State's Exhibit 4 (Exhibit 4) in evidence. This exhibit was offered to prove Defendant's prior felony conviction. *Exhibit 4 is a redacted copy of a judgment* in Criminal No. 57406 indicating that "Darren James Holbron" had been "convicted of . . . a felony under the Hawaii [Hawai'i] Revised Statutes."

. . . .

The State initially offered State's Exhibit 3 (*Exhibit 3), the unredacted judgment of conviction* from Criminal 57406, into evidence . . . .

. . . During a lengthy bench conference, counsel and the court discussed methods of admitting the exhibit without revealing the felony involved. . . . At the conclusion of the discussion, the parties agreed that a redacted version of the judgment would be submitted into evidence.

*State v. Holbron,* 78 Hawai'i 422, 428–29, 895 P.2d 173, 179–80 (App.1995) (emphases added) (footnotes omitted). The certified full

12. "To prove the content of a writing, . . . the original writing . . . is required, except as otherwise provided in these rules or by statute." HRE Rule 1002 (1993).

copy of the judgment in Criminal No. 57406, "State's Exhibit 3 (Exhibit 3)[,] was withdrawn at trial and [wa]s not in the record on appeal. But an unredacted copy of the judgment in Criminal No. 57406 was received into evidence at Defendant's sentencing hearing and is part of the record on appeal." *Id.* at 428 n. 8, 895 P.2d at 179 n. 8. Although the defendant contended at trial that Exhibit 4, the uncertified, redacted copy of judgment in Criminal No. 57406, was not admissible because, among other things, it lacked authentication, the *Holbron* court concluded that "Exhibit 4 had been properly authenticated by certification through Exhibit 3[,]" the certified copy of the full judgment in Criminal No. 57406, even though the prosecution withdrew Exhibit 3 from evidence. *Id.* at 429, 895 P.2d at 180.

Likewise in the instant case, the prosecution sufficiently authenticated the redacted judgment of Samonte's conviction by submitting for identification the certified copy of the full judgment of conviction for, among other things, burglary in the first degree. Although the redacted version of the judgment that was admitted into evidence was not a certified copy, if a certified copy of a public record "cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given." HRE Rule 1005 (1993). It was impossible to obtain a certified copy of the redacted judgment, because the circuit court did not keep a redacted version of the judgment as a public record; the circuit court kept only a full copy of the judgement as a public record. Because the prosecution also submitted to the trial court the certified copy of the full judgment of conviction for identification, along with the redacted judgment that was eventually admitted into evidence, we are satisfied that the redacted judgment of conviction was properly authenticated under HRE Rule 1005.

■ Even when a redacted copy of a judgment of conviction has been properly authenticated in this manner, however, the

prosecution must also adduce other testimony or evidence connecting the defendant to the previous judgment of conviction. *See Holbron,* 78 Hawai'i at 429–30, 895 P.2d at 180–81 (holding that, although the State had properly authenticated a redacted judgment of a defendant's previous conviction, the State nevertheless failed to establish a sufficient foundation for the redacted judgment because "the State should have obtained other testimony or evidence tying Defendant to the judgment."). But, in the instant case, the prosecution presented John Tam, who handled the prosecution of Samonte for, among other things, burglary in the first degree as a deputy prosecutor for the County of Maui. Tam identified Samonte as the person to whom the redacted judgment of conviction for burglary in the first degree referred, and furthermore, Tam testified that Samonte had been represented by counsel during that particular criminal proceeding. Thus, the prosecution satisfied the foundational requirements for having the redacted judgment of Samonte's previous conviction for burglary in the first degree admitted into evidence.

Accordingly, we hold that the trial court did not err by admitting into evidence the redacted judgment of Samonte's previous conviction for burglary in the first degree.

### F. Samonte's Conviction for Attempted Manslaughter by Reckless Conduct

■ Samonte was charged with the attempted murder in the first degree of Mrs. Ancheta and Glenn Ancheta in violation of HRS § 705–500 (1985) and HRS § 707–701(1)(a) (1993).[13] The trial court instructed the jury on attempted murder in the first degree, and informed the jury that if it was unable to reach a unanimous verdict, the jury was instructed to consider whether Samonte was guilty of the lesser included offense of attempted manslaughter by reason of extreme mental or emotional disturbance, the

---

**13.** HRS § 707–701(1)(a) (1993) provides, in pertinent part, the following:

§ **707–701 Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

(a) More than one person in the same or separate incident;

. . . .

elements of which the trial court further instructed the jury. If the jury was unable to reach a unanimous verdict as to that offense, the jury was instructed to consider whether Samonte was guilty of the lesser included offense of "attempted manslaughter by reason of reckless conduct," the elements of which the trial court instructed the jury. Finally, if the jury was unable to reach a unanimous verdict, then the jury would have to consider whether Samonte was guilty of the lesser included offense of reckless endangering in the second degree,[14] for which the trial court instructed the jury. After deliberations, the jury convicted Samonte of the lesser included offense of "attempted manslaughter by reckless conduct" in violation of HRS § 705–500 and HRS § 707–702(1)(a) (1993).[15]

We have held that "HRS §§ 705–500 and 707–702(1)(a) do not and cannot give rise to the offense of 'attempted manslaughter' under any circumstances[.]" *State v. Holbron,* 80 Hawai'i 27, 29, 904 P.2d 912, 914 (1995) (overruling *State v. Tagaro,* 7 Haw.App. 291, 757 P.2d 1175 (1987)), *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995). "[I]n light of this jurisdiction's criminal attempt liability statute, HRS § 705–500, ... there can be no offense of 'attempted manslaughter' within the meaning of HRS § 707–702(1)(a)[.]" *Holbron,* 80 Hawai'i at 45, 904 P.2d at 930. Therefore, Samonte's conviction for "attempted manslaughter by reason of reckless conduct" cannot stand.

■■■ However, we have held that a "trial court was correct in instructing the jury that reckless endangering in the second degree is a lesser included offense of attempted murder[.]" *State v. Feliciano,* 62 Haw. 637, 640, 618 P.2d 306, 308 (1980). The trial court read the following instruction to the jury with respect to the lesser included offense of reckless endangering in the second degree:

With respect to each charge of attempted murder in the first degree as set forth in counts I and II, if you are unable to reach a unanimous verdict that the defendant is guilty of attempted murder in the first degree, attempted manslaughter by reason of extreme emotional or mental disturbance or attempted manslaughter by reason of reckless conduct, then you shall consider whether the defendant is guilty of the lesser-included offense as [sic] reckless endangering in the second degree.

A person commits the offense of reckless endangering in the second degree if he engages in conduct which recklessly places another person in danger of death or serious bodily injury.

There are two material elements to this offense, each of which the prosecution must prove beyond a reasonable doubt. These two elements are:

1. That the defendant engaged in conduct which placed another person in danger of death or serious bodily injury; and

2. That he did so recklessly.

Serious bodily injury means bodily injury which creates a substantial risk of death or which caused serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

Pursuant to our holding in *Feliciano,* the jury could have convicted Samonte for reckless endangering in the second degree.

Therefore, although we vacate Samonte's conviction of attempted manslaughter by reason of reckless conduct, we remand this particular count for retrial on the issue of whether Samonte is guilty of the lesser included offense of reckless endangering in the

---

14. HRS § 707–714 (1985) defines the crime of reckless endangering in the second degree as follows:

§ **707–714 Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if he engages in conduct which recklessly places another person in danger of death or serious bodily injury.

(2) Reckless endangering in the second degree is a misdemeanor.

15. HRS § 707–702(1)(a) (1993) provides, in pertinent part, the following:

§ **707–702 Manslaughter.** (1) A person commits the offense of manslaughter if:

(a) He recklessly causes the death of another person;

. . . .

second degree with respect to Mrs. Ancheta and Glenn Ancheta.

### G. *Samonte's Sentences*

■ Samonte contends that the trial court erred in sentencing him to a harsher sentence after his third trial than the sentence he received after his first trial, in violation of HRS § 706–609 (1993). After Samonte's first trial, the trial court sentenced Samonte to, among other things, the following: two concurrent terms of life imprisonment without possibility of parole for the two counts of attempted murder in the first degree; ten years imprisonment for felon in possession of a firearm, with a mandatory minimum term of three years and four months; ten years imprisonment for felon in possession of ammunition, with a mandatory minimum term of three years and four months. All terms were to run concurrently. In Hawai'i Supreme Court Case Number 15720, we issued an order on July 16, 1992, vacating and remanding Samonte's judgment of conviction for a new trial pursuant to our holding in *State v. Echineque,* 73 Haw. 100, 828 P.2d 276 (1992), *reconsideration denied,* 73 Haw. 625, 832 P.2d 1129 (1992).

When Samonte was convicted for some of these same offenses in his third trial, Samonte was sentenced to, among other things, the following: life imprisonment without possibility of parole for the attempted murder in the first degree of Officer Cauton; twenty years imprisonment for felon in possession of a firearm in violation of HRS § 134–7(b) (1985),[16] and twenty years imprisonment for felon in possession of ammunition in violation of HRS § 134–7(b). All terms were to run concurrently. Thus, in the third trial the trial court gave Samonte a more severe sentence for his conviction for two offenses, felon in possession of a firearm and felon in possession of ammunition, than the trial court had given Samonte after his first trial.

We have "note[d] that HRS § 706–609 prevents a sentencing court from issuing a more severe sentence after the initial sentence has been set aside upon review." *Keawe v. State,* 79 Hawai'i 281, 289, 901 P.2d 481, 489 (1995).

**§ 706–609 Resentence for the same offense or for offense based on the same conduct not to be more severe than prior sentence.** When a conviction or sentence is set aside on direct or collateral attack, the court shall not impose a new sentence for the same offense, or for a different offense based on the same conduct, which is more severe than the prior sentence.

HRS § 706–609 (1993). In *Keawe,* we held that HRS § 706–609 was inapplicable where a "resentencing court did not impose a more severe 'sentence' on Keawe." *Keawe,* 79 Hawai'i at 289, 901 P.2d at 489. Originally, a trial court had entered judgments of conviction against Keawe in two criminal cases:

> In the first criminal case, . . . the circuit court sentenced Keawe to incarceration for an extended term of ten years, with a one year and eight month minimum term of imprisonment, and to pay restitution in the amount of $8,000. In the second criminal case, . . . the court sentenced Keawe to incarceration for an extended term of ten years as to each count, to run concurrently with each other, with a three-year minimum term of imprisonment, and to pay restitution in the amount of $10,538. Lastly, the sentences in [both criminal cases] were to be served concurrently with each other.

*Id.* at 282, 901 P.2d at 482. Subsequently, Keawe filed a Petition for Post–Conviction Relief under Rule 40 of the Hawai'i Rules of Penal Procedure (HRPP), arguing that the extended term was illegal because the court

---

16. HRS § 134–7 (1985) provides, in pertinent part, the following:

**§ 134–7 Ownership or possession prohibited, when; penalty** . . .

(b) No person who is under indictment or who has waived indictment for, or has been convicted in this State or elsewhere for having committed a felony, or any crime of violence, or of the illegal sale of any drug, shall own or have in the person's possession or under the person's control any firearm or ammunition therefor.

. . . .

(f) Any person violating subsection (a) or (b) shall be guilty of a class C felony, provided that *any felon violating subsection (b) shall be guilty of a class B felony.* Any person violating subsection (c), (d) or (e) shall be guilty of a misdemeanor.

(Emphasis added).

had failed to give him the statutorily required written notification for the possibility of an extended term, and as a result, we granted Keawe's Rule 40 petition and vacated Keawe's sentences. At his resentencing hearing, "the circuit court resentenced Keawe to a five-year indeterminative term of imprisonment in each criminal case with the terms to run consecutively." *Keawe,* 79 Hawai'i at 283, 901 P.2d at 483. On appeal, we addressed the issue of whether Keawe's second sentence violated HRS § 706–609, because Keawe complained that the "new consecutive five-year terms of imprisonment ... affected his parole status." *Keawe,* 79 Hawai'i at 289, 901 P.2d at 489. "In light of the language of HRS § 706–609 and the clear distinction between sentencing and paroling," we held "that HRS § 706–609 [wa]s inapplicable to cases where a new sentence, which is not more severe than a prior sentence, adversely affects a defendant's parole status." *Id.* at 290, 901 P.2d at 490.

Similar to *Keawe,* we vacated Samonte's original sentence of, among other things, two concurrent *ten-year* terms of imprisonment for felon in possession of a firearm and felon in possession of ammunition, to run concurrently. In contrast to *Keawe,* however, after Samonte's third trial for the same two offenses, the trial court violated HRS § 706–609 by giving Samonte a more severe sentence for these same two offenses: two concurrent extended *twenty-year* terms of imprisonment.

Because HRS § 706–609 prevents a sentencing court from issuing a more severe sentence after the initial sentence has been set aside upon review, we must vacate the limited portion of Samonte's sentence for his conviction of felon in possession of a firearm and felon in possession of ammunition, and we remand this matter for resentencing with respect to Samonte's convictions for felon in possession of a firearm and felon in possession of ammunition. Upon remand, the sentencing court shall resentence Samonte for these two convictions, and pursuant to HRS § 706–609, Samonte's new sentence for his conviction of these two offenses must not exceed two ten year terms of imprisonment, to run concurrently.

However, in both the first trial and the third trial, the trial courts convicted Samonte for the attempted first degree murder of Officer Cauton in violation of HRS § 705–500 (1985) and HRS § 707–701(1)(b) (1993), for which both trial courts sentenced Samonte to the same sentence: life imprisonment without the possibility of parole. Therefore, with respect to his conviction for the attempted murder in the first degree of Officer Cauton, Samonte did *not* receive a more harsh sentence in his third trial than he received in his first trial. Moreover, statutory authority supports Samonte's sentence. "Murder in the first degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656." HRS § 707–701(2) (1993). "Persons convicted of first degree murder or *first degree attempted murder* shall be sentenced to life imprisonment without possibility of parole." HRS § 706–656(1) (1993) (emphasis added). Therefore, we affirm Samonte's sentence of life imprisonment without possibility of parole resulting from his conviction for the attempted murder in the first degree of Officer Cauton.

## H. Samonte's Remaining Points of Error

After reviewing the remainder of the issues in Samonte's forty-seven points of error, we hold that they are without merit. We affirm all of the trial court's rulings with respect to the remaining issues in Samonte's forty-seven points of error.

## III. CONCLUSION

Based on the foregoing discussion, we affirm the trial court's denial of Samonte's motion to dismiss for violation of HRPP Rule 48. We affirm Samonte's conviction for the attempted murder in the first degree of Police Officer Herman Cauton, and we affirm Samonte's corresponding sentence of life imprisonment without possibility of parole. We vacate Samonte's conviction for the lesser included offense of "attempted manslaughter by reason of reckless conduct" with respect to Anita Ancheta and Glenn Ancheta, and we remand this particular count for a trial on the issue of whether Samonte is guilty of the

lesser included offense of reckless endangering in the second degree with respect to Anita Ancheta and Glenn Ancheta. We vacate Samonte's twenty year term of imprisonment for felon in possession of a firearm and his twenty year term of imprisonment for felon in possession of ammunition, and we remand this matter for resentencing with instructions that the sentencing court shall resentence Samonte with respect to these two convictions for no more than two ten year terms of imprisonment, to run concurrently. Finally, after reviewing all forty-seven of Samonte's points of error, we affirm all of the trial court's rulings with respect to the remaining issues in Samonte's forty-seven points of error.